UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

······················································· X

ITALIANA COKE, S.R.L.,                          :
                              Plaintiff,        :        Case No. 08-CV-4725 (JGK)

               vs.                              :        DECLARATION OF
                                                         MASSIMO BUSDRAGHI
UNITED COAL COMPANY, LLC,                        :

                              Defendant.        :

······················································· X

     I, MASSIMO BUSDRAGHI, hereby make the following declaration:

     1.     I am the General Manager for Italiana Coke, S.r.l. ("Italiana Coke"), and have held that position since February of 2006.  I have personal knowledge of the matters set forth herein or, where I do not have such personal knowledge, I have learned the information contained herein through my position with Italiana Coke.

     2.     I reside in Italy.

     3.     Italiana Coke is a corporation organized under the laws of Italy with its principal place of business in Savona, Italy.

     4.     Italiana Coke is a leading supplier of coke to foundries throughout Europe.  Coke is a product obtained through chemical processing of coking coal.

     5.     Italiana Coke's production facilities are located in Italy.

     6.     Italiana Coke does not have an office, a plant, equipment, employees, or a phone number in Virginia.

7.      Italiana Coke is not and has never been registered with the Virginia Corporation Commission or otherwise licensed or qualified to do business in Virginia.

8.      Italiana Coke does not have an agent for service of process in Virginia.

9.      Italiana Coke is not and has never been incorporated in the State of Virginia.

10.     Prior to the instant case, Italiana Coke has never sued or been sued in Virginia.

11.     Within the last 14 years, Italiana Coke has not sold its products to any purchaser within Virginia or within the United States.

12.     All of Italiana Coke's employees with knowledge of this matter reside in Italy.

13.     All of Italiana Coke's documents relevant to this case are located in Italy.

14.     Prior to 2006, Italiana Coke purchased a portion of its coal requirements from Rapoca Sales ("Rapoca").  Upon the acquisition of Rapoca by United Coal Company ("United") in January of 2006, United assumed Rapoca's contracts with Italiana Coke.

15.     Since 2006, Italiana Coke has entered into yearly supply contracts with United for the purchase of Wellmore High Volatile Coking Coal and Pocahontas Low Volatile Coking Coal ("Wellmore" and "Pocahontas" coal) from United's coal mines located in Virginia and West Virginia, respectively.

16.     Each year, these contracts were negotiated by representatives from Italiana Coke, United, and United's Agent at meetings held at Italiana Coke's facilities in Italy or at annual coal-industry conventions held throughout the world.

17.     Each contract required United to arrange for coal to be shipped by rail directly from its mines located in West Virginia and Virginia to the Port of Norfolk.  Approximately 50% of the

coal originated in mines located in West Virginia, and only passed through Virginia on the way to the Port of Norfolk.  Once the coal was delivered to the Port of Norfolk, it was loaded onto chartered vessels, with the risk of loss passing to Italiana Coke ("FOBT") upon loading.  These vessels then delivered the coal to Italiana Coke's facilities in Italy.

18.    True and correct copies of signed contracts between United and Italiana Coke for the sale of coal for the period from April 1, 2006 through March 31, 2007 (the "2006-2007 Contract") are attached hereto as Exhibit A.

19.    True and correct copies of signed contracts between United and Italiana Coke for the sale of coal for the period from April 1, 2007 through March 31, 2008 (the "2007-2008 Contract") are attached hereto as Exhibit B.

20.    Approximately half of the coal United sold to Italiana Coke under each yearly contract was shipped from United's mines located in West Virginia, with the other half shipped from United's mines located in Virginia.

21.    No contract negotiations between Italiana Coke and United ever took place in Virginia.

22.    On or about December 4, 2007, Stefano Tomisti and I, as representatives for Italiana Coke, met with Ralph Haring and Gary Chilcot, as representatives for United, and Monica Zappalaglio of Agenzia Carboni, Defendant's Italian agent ("Defendant's Agent"), in Stockholm, Sweden (the "Stockholm meeting"), to negotiate the terms of a sale and purchase agreement for Wellmore and Pocahontas coal for the period between April 1, 2008 and March 31, 2009 (collectively, the "2008-2009 Contract").

23.     At the Stockholm meeting, the parties agreed upon all material terms of the 2008-2009 Contract.

24.     The parties agreed that aside from the material terms negotiated at the Stockholm meeting (such as price and quantity), all other terms of the 2008-2009 Contract would be the same as those contained in prior contracts between the parties, including a choice of law clause specifying that the agreement would be governed by and construed in accordance with the laws of the State of New York, as well as a clause compelling the parties to arbitrate all disputes related to the contract in New York, New York.

25.     Shortly thereafter, the terms of the contract agreed upon at the Stockholm meeting were memorialized and confirmed in emails exchanged between Italiana Coke, United and United's Agent.

26.     A true and correct copy of an email sent from United's Agent to United and Italiana Coke on December 7, 2007 is attached hereto as Exhibit C.

27.     A true and correct copy of an email sent from Italiana Coke to United and United's Agent on December 10, 2007 is attached hereto as Exhibit D.

28.     In these confirmatory emails memorializing and confirming the agreement, United requested a minor change to the moisture quality of the Pocahontas coal, which Italiana Coke readily accepted.  A true and correct copy of the email correspondence between United, United's Agent, and Italiana Coke is attached hereto as Exhibit E.

29.     On or about January 14, 2008, Defendant's Agent sent an email to Italiana Coke, attaching a written draft of the 2008-2009 Contract entered into at the Stockholm meeting.  A true and correct copy of the covering email and attached 2008-2009 Contract sent from United's

Agent to Italiana Coke is attached hereto as Exhibit F.  A certified translation of the covering email, which is in Italian, is attached hereto as Exhibit G.

30.    On or about March 4, 2008, Italiana Coke sent an email to United, setting forth a shipping schedule for the 2008-2009 Contract.  United responded, via email, stating that Italiana Coke's shipping schedule seemed acceptable.  A true and correct copy of this email correspondence is attached hereto as Exhibit H.

31.    As the termination date for the 2007-2008 Contract approached, United remained obligated to ship approximately 7,500 metric tons of Pocahontas coal and 14,000 metric tons of Wellmore coal to Italiana Coke under the terms of the 2007-2008 Contract.

32.    On or around March 6, 2008, United notified Italiana Coke by email of production problems that necessitated a delay on the shipment of Wellmore coal that remained due under the 2007-2008 Contract.  United suggested replacing the installment of Wellmore coal with an extra installment of Pocahontas coal.   A true and correct copy of this email correspondence is attached hereto as Exhibit I.

33.    On or around March 7, 2008, Italiana Coke agreed to United's suggestion, and proposed a new shipping schedule for the remaining coal due to be shipped under the 2007-2008 Contract, as well as for all 2008 deliveries under the 2008-2009 Contract.  A true and correct copy of this email correspondence is attached hereto as Exhibit J.

34.    By email dated March 10, 2008, United reiterated its offer to ship the final installment of Pocahontas coal due under the 2007-2008 Contract, along with an additional installment of Pocahontas coal under the 2008-2009 Contract.  In an email response sent later that day, Italiana Coke accepted Defendant's proposal, with the understanding that the additional installment of Pocahontas coal would be considered as part of the 2008-2009 Contract and would

be sold at the 2008-2009 Contract price of $135 per metric ton. A true and correct copy of this email correspondence is attached hereto as Exhibit K.

35.     Thereafter, on or around March 26, 2008, United caused the two installments of Pocahontas coal to be loaded together on a train bound for Italiana Coke's chartered vessel docked at Norfolk, Virginia.

36.     On or about March 26, 2008, less than a week before the commencement of the 2008-2009 Contract term, United sent Italiana Coke another written version of the 2008-2009 Contract via email, with minor changes regarding the force majeure clause and the 10% buyer's option. United did not propose any other changes to the 2008-2009 Contract. A true and correct copy of this email, and the 2008-2009 Contract is attached hereto as Exhibit L.

37.     Stefano Tomisti and I had previously agreed to meet with representatives of United during the first week in April, 2008, in New York, NY.

38.     On or around April 3, 2008, Stefano Tomisti and I, as representatives for Italiana Coke, met again with Ralph Haring and Gary Chilcot, as representatives for United, and Monica Zappalaglio of United's Agent, in New York, New York (the "New York meeting"). Both Stefano and I expected that at the New York meeting, the parties would execute written versions of the 2008-2009 Contract, which Ralph Haring had emailed to Italiana Coke approximately a week before. To our surprise, however, United's representatives at the New York meeting claimed that no contract existed for the 2008-2009 year, and that they were under no obligation to load the first installment of Pocahontas coal under the 2008-2009 Contract. Instead, United's representatives insisted that Italiana Coke would have to purchase the additional hold of Pocahontas coal from United at the "spot" price, which was more than double the price agreed upon at the Stockholm meeting.

39.     When talks resumed later in the day in New York, Italiana Coke and United reached

an interim agreement, under which United's obligations under the 2007-2008 Contract would be

considered fully satisfied.  The parties agreed that United would deliver the second installment of

Pocahontas coal that had previously been meant by all parties to be delivered under the terms of

the 2008-2009 Contract and had already been loaded for Italiana Coke prior to the NY Meeting, in

place of the Wellmore coal that United would still have been obligated to deliver under the terms

of the 2007-2008 Contract.  The parties also agreed to reserve their rights regarding the question of

the existence of the 2008-2009 Contract.  A true and correct copy of the signed interim agreement

is attached hereto as Exhibit M.

40.     After the New York meeting, on or about April 15, 2008, Italiana Coke sent a letter

to United, expressing its shock at United's assertion that no contract existed for 2008-2009 and

reiterating that a binding agreement was entered into at the Stockholm meeting.  In that letter,

Italiana Coke also requested confirmation of the proposed details of the parties' first coal shipment

under the 2008-2009 Contract, which, according to the terms of 2008-2009 Contract (and all

previous contracts between Italiana Coke and United), triggered a duty for United to confirm the

details of the request within five (5) business days.  A true and correct copy of a letter sent from

Italiana Coke to United, dated April 15, 2008, is attached hereto as Exhibit N.

41.    Instead of receiving confirmation, United sent Italiana Coke a letter on April 18,

2008, rejecting the request for shipment and, again, denying the existence of the 2008-2009

Contract.  A true and correct copy of a letter sent from United to Italiana Coke, dated April 18,

2008, is attached hereto as Exhibit O.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 28, 2008
Savona , Italy

_____
Massimo Busdraghi

# Exhibit A

### *SALE AND PURCHASE AGREEMENT*
### *POCAHONTAS LOW VOLATILE COKING COAL*

THIS AGREEMENT made the 5th day of May 2006, where United Coal Company, LLC (SELLER), hereby agrees to sell coal and Italiana Coke S.p.a. (BUYER), agrees to buy coal under the terms and conditions hereinafter set forth.

WITNESSETH:

SELLER agrees to sell and deliver to BUYER and BUYER agrees to accept and pay for coal specified below under the terms and conditions hereinafter set forth:

1.    COMMODITY

Pocahontas Low Volatile Coking Coal from the Josephine #1, Josephine #2 and Tommy Creek mines owned and operated by Seller.

2.    QUANTITY

One trial cargo with a minimum volume of 8,000 metric tonnes and a maximum of 10,000 metric tonnes, to be mutually determined between Buyer and Seller based upon cargo hold capacity as arranged by Buyer (the "Trial Tonnes"); and additional shipments of 20,000 metric tonnes (the "Balance Tonnes") to be apportioned in accordance with Buyer's shipping arrangements. Buyer shall have the option Balance Tonnes to increase or decrease this quantity by 10%. Buyer will advise Seller within 40 days after receiving Trial Tonnes if, at Italiana Coke's sole judgment, the results of the trial cargo are satisfactory or not. If satisfactory, then Buyer automatically declares and confirms the Balance Tonnes, whereas if not satisfactory then Buyer's sole obligation shall be to take delivery of and pay all amounts owed for the Trial Tonnes.

3.    DELIVERY OF THE GOODS - REQUEST OF STEMS

Trial Tonnes will be loaded in Norfolk on a vessel's with laycan May 21-26, 2006, to be arranged by Buyer. For Balance Tonnes (if confirmed by Buyer) BUYER has to require stems in writing at least 45 days prior to the expected loading date and SELLER has to confirm stems within five (5) working days from the date of BUYER's request. In the event Seller fails to confirm stems, the stems shall be considered as confirmed by SELLER.

4.    TERM

The term of this Agreement shall commence on April 1, 2006 and end on March 31, 2007.

5.    SPECIFICATIONS

The coal delivered hereunder shall be "Pocahontas Low Volatile Coking Coal" and shall conform to the following typical (and guaranteed where indicated) specifications:



2

| Moisture (air) | 8.00 % max |
| On dry basis : Volatile Matters (d.b.) | 17.50 %max |
| Ash (d.b.) | 6.75+0.75% max |
| Sulfur (d.b.) | 0.90+0.10 % max |
| FSI | 7-9 |
| Arnu -Dilatation | +35 |
| Fluidity | +60 ddpm |
| Mean-Max Reflectance | 1.64 |
| Sizing | 0 X 50mm |

6.   **DELIVERY**

A) Coal shall be delivered hereunder FOBT (stowed and trimmed) vessel at the Norfolk Southern coal loading piers in Norfolk (Hampton Roads), Virginia, U.S.A. (the 'Loading Port') with title and risk of loss and damage to the coal passing from Seller to Buyer upon loading into the vessel (as per INCOTERMS 2000).

B) Shipping Terms and Loading Conditions, Norfolk Southern Pier #6

(i)    Loadport - Hampton Roads, Norfolk, Virginia, USA, one good, safe and always acceptable berth.

(ii)    Fixation of Laydays - Buyer to give Seller thirty (30) days notice of fifteen (15) days laycan spread. Seller to accept or refuse within forty-eight (48) consecutive hours thereafter. Upon nomination, Buyer or their agents, shall give the vessel name, details and tonnage to be loaded plus or minus 5%, Buyer's option.

(iii)    Nomination - BUYER or their Agents to nominate the carrying vessel on the basis of a 15-day laycan.

(a) BUYER to give notice of ETA at loadport fourteen (14) days prior to the expected ETA of vessel

(b) Ten (10) days prior to the expected ETA at loadport, Buyer, or the owner or master of the vessel, to give definite notice of the vessel to be loaded. Buyer shall be obligated to inform Seller in writing of the final quantity to be loaded no less than ten (10) days before scheduled vessel loading. Further notices to be given 7, 5, 2 and 1 days prior to vessel ETA at loading port to confirm vessel arrival schedule at Loadport.



3

Loading Terms - According to Norfolk Southern C-5222 Contract Conditions

Agents - Buyer to nominate their own agents at the loading port.

Railcar demurrage - Seller will be responsible for any railway car debit demurrage incurred if any cars remain of Seller shipments after completion of the loading of the vessel.

7.    LOADING AND DEMURRAGE

SELLER shall be fully responsible for any vessel's demurrage due to late arrival of SELLER's coal at the port of loading hereunder. Demurrage charges shall begin to accrue to SELLER's account 48 hours after vessel's scheduled Loading Date and end at the beginning of vessel loading. Vessel's demurrage to be reimbursed to BUYER based on a commercially reasonable allocation of such demurrage based on: (a) the proportion of the coal delivered by SELLER bears to the total tons loaded on the vessel; and (b) the proportion of the number of days the vessel was delayed in loading as a result of SELLER's delay in delivery bears to the total number of days of vessel delay.

In the event Norfolk and Southern Railroad fails or refuses to supply adequate rail cars to SELLER for loading at the Seller's mines to meet a vessel load date on the grounds that other suppliers being loaded in the same vessel are not mine ready to load, SELLER shall not be liable for demurrage charges to Buyer, provided that SELLER may provide Norfolk and Southern records to BUYER proving such situation and relevant responsible supplier(s) in default. In such a case only the non-performing Seller(s) shall be the only one(ones) that will be held fully responsible for the total amount of vessel's demurrage.

8.    PRICE

Firm price for the entire Term shall be USD $115.50 per metric ton F.O.B.T. vessel Norfolk Southern Pier VI. This price includes any rail and dumping increases and fuel Surcharge for export shipments on N&S railroad which becomes effective as of April 2006.

9.    WEIGHT

The weights set forth on the Bills of Lading shall be the Railroad scale weight (Pier 6), accepted by both parties hereto as final and binding. The N&S Railway weight certificates shall support these weights.

10.    PAYMENT

Payment shall be made by BUYER to SELLER in United States dollars not later than 30 days from the date set forth on the Bill of Lading from the loading vessel. Such payments shall be made by wire transfer to SELLER's bank account as stated on the invoice.



4

## 11.  SAMPLING AND ANALYSIS

Mechanical sampling and analysis shall be made at the Loading Port, according to applicable ASTM Standards for Sampling and Analysis. The mechanical sampling shall be conducted by the Company hired by the Terminal to perform such sampling. The loading Port analysis shall be determined by an independent, first-class laboratory (the "Independent Laboratory", chosen by Seller and acceptable to Buyer and the analysis performed by the Independent Laboratory shall be final for calculating the commercial terms for invoicing the value of the Coal sold. The Independent Laboratory shall send promptly by courier one sample (about 1 kilo of coal crashed to size below 5 mm) split from the composite sample to BUYER.  The cost for sampling and analysis shall be for Seller's account. Buyer has the right at any time after first notifying Seller to instruct a recognized, independent, first-class laboratory to carry out sampling and analysis at discharging port. The costs of sampling/analyses performed at discharging port are for Buyer's account. In the event that there should be a substantial difference in quality results as determined at the Loading and Discharging Ports, Buyer and Seller shall meet to discuss a fair solution.

## 12.  DOCUMENTATION

SELLER shall provide the following documents to BUYER:

(i)      One original and three copies of Commercial Invoice
(ii)     First, second and third original and three copies non-negotiable Bills of Lading
(iii)    Original and two copies of Certificate of Origin
(iv)     Original and two copies of Railway Weight Certificate
(v)      Original and two copies of Stowage Plan
(vi)     Original and two copies of Statement of Facts
(vii)    Original and two copies of Notice of Readiness
(viii)   Original and two copies of Certificate of Analysis from Independent Laboratory
(ix)     Dump sheet



5

SELLER shall promptly render all documentation to BUYER at the following address:

Dott. Stefano Tomisti
Italiana Coke S.p.A.
Via Stalingrado 25
17014 S. Giuseppe di Cairo  (Savona)
Italy

13.    PENALTIES

Should the results of the analysis by the Independent Laboratory carried out according to applicable ASTM Standards on each cargo exceed those specifications, penalties shall be assessed to the SELLER in the following amounts:

MOISTURE:   If moisture content exceeds 8.00% on an "as received" basis, a penalty of 1.0% of the FOBT price shall apply for each 1.0% above 8.00%, fractions pro rata.

ASH:        If ash content exceeds 7.50% on a "dry basis", a penalty of 2.3% of the FOBT price shall apply for each 1.0% above 6.75%, fractions pro rata.

VOLATILE:   If volatile content exceeds 17.50% on a "dry basis", a penalty of 1.2% of the FOBT price shall apply for each 1% above 17.50%, fractions pro rata.

SULPHUR:    If sulphur content exceeds 1.00% on a "dry basis", a penalty of 2.0% of the FOBT price shall apply for each 0.1% above 0.90%, fractions pro rata.

ADDITIONAL TESTING:
Should the Buyer decide to arrange for sampling/analysis at discharging port as specified in paragraph 11 herein, the parties shall meet to discuss the analyses if the results differ by more than the ASTM standards for tolerances between different laboratories.

14.    FORCE MAJEURE

Seller shall not be liable for delay, reduction, or suspension of deliveries resulting from any cause beyond its reasonable control and Buyer shall not be liable for any inability to accept delivery of coal under this Agreement resulting from any cause beyond its reasonable control, provided that Buyer or Seller, as the case may be, shall advise the other party promptly by a written notice describing the situation in detail. Such notice shall be accompanied by documentary evidence if available as to the occurrence of the event and the likely duration thereof and the party claiming force majeure shall promptly exert due diligence to remove such cause. Causes beyond reasonable control of Seller and Buyer shall include, but not be limited to, floods, fires, accidents, strikes, major breakdowns of equipment, shortages of transportation carrier's equipment caused by an event of Force Majeure declared by the transportation carrier, or other reasons, whether of the same or different nature, existing or future, foreseen or unforeseeable, which are beyond the control and without the fault or negligence of the parties hereto but specifically excluding economic factors alone. No suspension or reduction for reason of Force Majeure shall invalidate the remainder of this Contract; but, on removal of the cause,

6

delivery shall resume at the specified date. Deficiencies so caused shall be made up according to what foreseen at the following paragraph 15 concerning" Performance".

15.    PERFORMANCE

Reliability and regularity in Seller's coal deliveries is an essential item of this Agreement. If for any reason, SELLER should (i) fail to deliver any of the cargoes on the dates already confirmed according to paragraph 3 of this Agreement; or (ii) Seller should fail to deliver the quantity at the time required by BUYER from the source set forth in paragraph 1, then in that instance SELLER shall deliver coal of a similar quantity and quality from another supplier/mine at the same terms/conditions as per this Agreement after first notifying BUYER within 20 days prior to the expected Loading Date (the "Replacement Coal").. Failing the delivery of suitable Replacement Coal by Seller, only then shall BUYER be entitled to look for and buy other suitable coal on the spot market (Buyer's "Cover Coal"). The price difference, if any, for the Cover Coal shall be for SELLER's account. The BUYER in addition to its other rights, shall have the right, as its option, to cancel this quantity from the contractual balance or to extend the Term of this Agreement to permit Seller to deliver.

16.    GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the law of the State of New York.

17.    ARBITRATION

All disputes, controversies or claims between the parties in connection with this Agreement shall be determined by arbitration at New York, N.Y., in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

18.    MUTUAL COOPERATION

The parties recognize that circumstances may arise which could not have been foreseen at the time this Agreement was executed. The parties agree that they will use their best efforts to solve any problems due to any such unforeseeable circumstances in the spirit of mutual understanding and in good faith.

19.    LIMITATION OF LIABILITY

In no event shall either party be responsible to the other for incidental, special or consequential damages arising out of a default in the performance of any of its covenants or obligations hereunder. Seller's contractual liabilities and Buyer's contractual remedy for coal not in conformance with the specifications of this Agreement shall be limited to the provisions of this Agreement.





7

20.    DISCLAIMER OF IMPLIED WARRANTIES

SELLER HEREBY DISCLAIMS, AND BUYER HEREBY WAIVES, ANY AND ALL IMPLIED AND STATUTORY WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND ANY WARRANTIES ARISING FROM ANY COURSE OF DEALING OR USAGE OF TRADE.

21.    GOVERNMENT IMPOSITION

This Agreement and the performance of all provisions hereof are expressly subject to any present or future laws and to all rules and regulations promulgated by any governmental agency having jurisdiction which may preclude or curtail Seller's right or ability to produce Coal to be delivered hereunder ~~at a reasonable profit~~ or Buyer's right or ability to receive deliveries hereunder.  Provided, however, the terms of this paragraph shall not, in any event, excuse Buyer from the payment for coal already shipped on board a nominated and accepted vessel.

22.    ASSIGNMENT

Seller agrees not to assign or sublet or delegate this contract or any part thereof or any payment to be received hereunder without consent of the Buyer.

23.    NOTIFICATION

All notifications given in relation to this Agreement shall be sent to the addresses below, by prepaid registered airmail, written in English, or by telefacsimile. Notice shall be deemed to be given when such letter or telefacsimile arrives at the address below:

          To Buyer:      Italiana Coke S.p.a.
                         Via Stalingrado 25
                         17014 S. Giuseppe di Cairo
                         Italy
                         Tel.:   +39 019-5067220
                         Fax:    +39 019-5067902
                         E-mail: mat.log@italianacoke.it

          To Seller:     United Coal Company
                         1005 Glenway Avenue
                         Bristol, Virginia  24201 USA

                         Tel. 276-466-3322
                         Fax 276-645-1438
                         E-mail rharing@unitedco.net




8

24.   CAPTIONS

Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.

25.   ENTIRE AGREEMENT

This Agreement contains the entire agreement between the parties and supersedes any and all prior representations, understandings and agreements, oral or written, which are not included herein. This Agreement cannot be altered or amended except by issuance of an addendum signed by authorized representatives of the parties.

IN WITNESS WHEREOF, the parties hereto have caused the Agreement to be executed by their respective officers hereunder duly authorized, as of the day and year first above written.

Buyer:
Italiana Coke S/p.A.

By:

Date: 25th May 2006

Seller:
United Coal Company

By:

Date: 5/4/06

### *SALE AND PURCHASE AGREEMENT*
### *WELLMORE HIGH VOLATILE COKING COAL*

THIS AGREEMENT made the 20th day of June 2006, where Wellmore Coal Company, LLC (SELLER), hereby agrees to sell coal and Italiana Coke S.p.a. (BUYER), agrees to buy coal under the terms and conditions hereinafter set forth.

WITNESSETH:

SELLER agrees to sell and deliver to Buyer and Buyer agrees to accept and pay for coal specified below under the terms and conditions hereinafter set forth:

1.    COMMODITY

Freshly mined High-Volatile Coking Coal from  Wellmore #8 mine owned and operated by Seller, Wellmore Coal Company LLC.

2.    QUANTITY

35,000 metric tonnes (the "Contract Quantity), with Buyer having the option to increase or decrease the Contract Quantity by 10% in its discretion by providing timely notice to Seller.

3.    DELIVERY OF THE GOODS - REQUEST OF STEMS

Shipments of the Contract Quantity shall be requested by Buyer in increments between 8,000 and 12,000 metric tonnes during the Term, with shipping dates to be mutually agreed with Seller, with both parties acting in good faith to schedule regular deliveries.  Buyer has to request stems in writing at least 45 days prior to the expected loading date for a cargo of coal subject hereto, and Seller has to confirm such proposed stems within five (5) working days from the date of Buyer's request. In the event Seller fails to confirm stems, the stems shall be considered as confirmed by Seller.

4.    TERM

The Term of this Agreement shall commence on April 1, 2006 and end on March 31, 2007.





2

5. <u>SPECIFICATIONS</u>

The coal delivered hereunder shall be "Wellmore High Volatile Coking Coal" and shall conform to the following typical (and guaranteed where indicated) specifications:

| | |
|---|---|
| Moisture (air) | 8.00 % max |
| On dry basis : | |
| Volatile Matters (d.b.) | 31.50 +0.5% max |
| Ash (d.b.) | 6.5 +0.25% max |
| Sulfur (d.b.) | 0.95 +0.05 % max |
| FSI | 7-9 |
| Arnu -Dilatation | +230 min |
| Fluidity | 25,000 ddpm min |
| Sizing | 0 X 50mm |

6. <u>DELIVERY</u>

A) Coal shall be delivered hereunder FOBT (stowed and trimmed) vessel at the Norfolk Southern coal loading piers in Norfolk (Hampton Roads), Virginia, U.S.A. (the "Loading Port") with title and risk of loss and damage to the coal passing from Seller to Buyer upon loading into the vessel (as per INCOTERMS 2000).

B) Shipping Terms and Loading Conditions, Norfolk Southern Pier #6

(i)    <u>Loadport</u> - Hampton Roads, Norfolk, Virginia, USA, one good, safe and always acceptable berth.

(ii)    <u>Fixation of Laydays</u> - Buyer to give Seller thirty (30) days notice of fifteen (15) days laycan spread. Seller shall accept or refuse within forty-eight (48) consecutive hours thereafter. Upon nomination, Buyer or its agents shall give the vessel name, details and tonnage to be loaded plus or minus 5%, Buyer's option.

(iii)    <u>Nomination</u> - Buyer or its Agents to nominate the carrying vessel on the basis of a 15-day laycan.

(a) Buyer to give notice of ETA at Loading Port fourteen (14) days prior to the expected ETA of vessel

(b) Ten (10) days prior to the expected ETA at Loading Port, Buyer, or the owner or master of the vessel, to give definite notice of the vessel to be loaded.  Buyer shall be obligated to inform Seller in writing of the

3

final quantity to be loaded no less than ten (10) days before scheduled vessel loading. Further notices to be given 7, 5, 2 and 1 days prior to vessel ETA at Loading Port to confirm vessel arrival schedule at Loading Port.

<u>Loading Terms</u> - According to Norfolk Southern C-5222 Contract Conditions

<u>Agents</u> - Buyer to nominate its own agents at the Loading Port.

<u>Railcar demurrage</u> - Seller will be responsible for any railway car debit demurrage incurred if any cars remain of Seller shipments after completion of the loading of the vessel.

7.    <u>LOADING AND DEMURRAGE</u>

Seller shall be fully responsible for any vessel's demurrage due to late arrival of Seller's coal at the Loading Port. Demurrage charges shall begin to accrue to Seller's account 48 hours after vessel's scheduled Loading Date and end at the beginning of vessel loading. Vessel's demurrage to be reimbursed to Buyer based on a commercially reasonable allocation of such demurrage based on: (a) the proportion of the coal delivered by Seller bears to the total tons loaded on the vessel; and (b) the proportion of the number of days the vessel was delayed in loading as a result of Seller's delay in delivery bears to the total number of days of vessel delay.

In the event Norfolk Southern Railroad fails or refuses to supply adequate rail cars to SELLER for loading at the Seller's mines to meet a vessel load date on the grounds that other suppliers being loaded in the same vessel are not mine ready to load, SELLER shall not be liable for demurrage charges to Buyer, provided that SELLER may provide Norfolk Southern records to BUYER proving such situation and relevant responsible supplier(s) in default. In such a case only the non-performing seller(s) shall be held fully responsible for the total amount of vessel's demurrage.

8.    <u>PRICE</u>

Firm price for the entire Term shall be USD $114.50 per metric ton F.O.B.T. vessel Norfolk Southern Pier VI. This price includes any rail and dumping increases and fuel surcharge for export shipments on Norfolk Southern Railroad that becomes effective as of April 2006.

9.    <u>WEIGHT</u>

The weights set forth on the Bills of Lading shall be the Railroad scale weight (Norfolk Southern Pier 6), accepted by both parties hereto as final and binding. The Norfolk Southern Railroad weight certificates shall support these weights.

4

10.    <u>PAYMENT</u>

Payment shall be made by Buyer to Seller in United States dollars not later than 30 days from the date set forth on the Bill of Lading from the loading vessel. Such payments shall be made by wire transfer to Seller's bank account as stated on the invoice.

11.    <u>SAMPLING AND ANALYSIS</u>

Mechanical sampling and analysis shall be made at the Loading Port, according to applicable ASTM Standards for Sampling and Analysis. The mechanical sampling shall be conducted by the company hired by the Terminal to perform such sampling. The Loading Port analysis shall be determined by an independent, first-class laboratory (the "Independent Laboratory", chosen by Seller and acceptable to Buyer, and the analysis performed by the Independent Laboratory shall be final for calculating the commercial terms for invoicing the value of the Coal sold. The Independent Laboratory shall send promptly by courier one sample (approximately 1 kilo of coal crashed to size below 5 mm) split from the composite sample to Buyer.  The cost for sampling and analysis shall be for Seller's account. Buyer has the right at any time after first notifying Seller to instruct a recognized, independent, first-class laboratory to carry out sampling and analysis at the discharging port. The costs of sampling/analyses performed at discharging port are for Buyer's account. In the event that there should be a substantial difference in quality results as determined at the Loading and Discharging Ports, Buyer and Seller shall meet to discuss a fair solution.

12.    <u>DOCUMENTATION</u>

SELLER shall provide the following documents to Buyer:

(i)      One original and three copies of Commercial Invoice
(ii)     First, second and third original and three copies non-negotiable Bills of Lading
(iii)    Original and two copies of Certificate of Origin
(iv)     Original and two copies of Railway Weight Certificate
(v)      Original and two copies of Stowage Plan
(vi)     Original and two copies of Statement of Facts
(vii)    Original and two copies of Notice of Readiness
(viii)   Original and two copies of Certificate of Analysis from Independent Laboratory
(ix)     Dump sheet



5

Seller shall promptly render all documentation to Buyer at the following address:

Dott. Stefano Tomisti
Italiana Coke S.p.A.
Via Stalingrado 25
17014 S. Giuseppe di Cairo  (Savona)
Italy

13.    <u>PENALTIES</u>

Should the results of the analysis by the Independent Laboratory carried out according to applicable ASTM Standards on each cargo exceed those specifications, penalties shall be assessed to the Seller in the following amounts:

MOISTURE:  If moisture content exceeds 8.00% on an "as received" basis, a penalty of 1.0% of the FOBT price shall apply for each 1.0% above 8.00%, fractions pro rata.

ASH:         If ash content exceeds 6.75% on a "dry basis", a penalty of 2.3% of the FOBT price shall apply for each 1.0% above 6.50%, fractions pro rata.

VOLATILE:  If volatile content exceeds 32.00% on a "dry basis", a penalty of 1.2% of the FOBT price shall apply for each 1% above 32.00%, fractions pro rata.

SULPHUR:   If sulphur content exceeds 1.00% on a "dry basis", a penalty of 2.0% of the FOBT price shall apply for each 0.1% above 0.95%, fractions pro rata.

ADDITIONAL TESTING:
Should the Buyer decide to arrange for sampling/analysis at discharging port as specified in paragraph 11 herein, the parties shall meet to discuss the analyses if the results differ by more than the ASTM standards for tolerances between different laboratories.

14.    <u>FORCE MAJEURE</u>

Seller shall not be liable for delay, reduction, or suspension of deliveries resulting from any cause beyond its reasonable control and Buyer shall not be liable for any inability to accept delivery of coal under this Agreement resulting from any cause beyond its reasonable control, provided that Buyer or Seller, as the case may be, shall advise the other party promptly by a written notice describing the situation in detail. Such notice shall be accompanied by documentary evidence if available as to the occurrence of the event and the likely duration thereof and the party claiming force majeure shall promptly exert due diligence to remove such cause. Causes beyond reasonable control of Seller and Buyer shall include, but not be limited to, floods, fires, accidents, strikes, major breakdowns of equipment, shortages of transportation carrier's equipment caused by an event of Force Majeure declared by the transportation carrier, or other reasons, whether of the same or different nature, existing or future, foreseen or unforeseeable, which are beyond the control and without the fault or negligence of the parties hereto but specifically excluding economic factors alone. No suspension or reduction for reason of Force Majeure shall invalidate the remainder of this Contract; but, on removal of the cause,



6

delivery shall resume at the specified date. Deficiencies so caused shall be made up according to what foreseen at the following paragraph 15 concerning" Performance".

15. <u>PERFORMANCE</u>

Reliability and regularity in Seller's coal deliveries is an essential item of this Agreement. If for any reason, Seller should (i) fail to deliver any of the cargoes on the dates already confirmed according to paragraph 3 of this Agreement; or (ii) Seller should fail to deliver the quantity at the time required by Buyer from the source set forth in paragraph 1, then in that instance Seller shall deliver coal of a similar quantity and quality from another supplier/mine at the same terms/conditions as per this Agreement after first notifying Buyer within 20 days prior to the expected Loading Date (the "Replacement Coal"). Failing the delivery of suitable Replacement Coal by Seller, only then shall Buyer be entitled to look for and buy other suitable coal on the spot market (Buyer's "Cover Coal"). The price difference, if any, for the Cover Coal shall be for Seller's account. The Buyer in addition to its other rights shall have the right, as its option, to cancel this quantity from the contractual balance or to extend the Term of this Agreement to permit Seller to deliver.

16. <u>GOVERNING LAW</u>

This Agreement shall be governed by and construed in accordance with the law of the State of New York.

17. <u>ARBITRATION</u>

All disputes, controversies or claims between the parties in connection with this Agreement shall be determined by arbitration at New York, N.Y., in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

18. <u>MUTUAL COOPERATION</u>

The parties recognize that circumstances may arise which could not have been foreseen at the time this Agreement was executed. The parties agree that they will use their best efforts to solve any problems due to any such unforeseeable circumstances in the spirit of mutual understanding and in good faith.

19. <u>LIMITATION OF LIABILITY</u>

In no event shall either party be responsible to the other for incidental, special or consequential damages arising out of a default in the performance of any of its covenants or obligations hereunder. Seller's contractual liabilities and Buyer's contractual remedy for coal not in conformance with the specifications of this Agreement shall be limited to the provisions of this Agreement.





7

20.    DISCLAIMER OF IMPLIED WARRANTIES

SELLER HEREBY DISCLAIMS, AND BUYER HEREBY WAIVES, ANY AND ALL IMPLIED AND STATUTORY WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND ANY WARRANTIES ARISING FROM ANY COURSE OF DEALING OR USAGE OF TRADE.

21.    GOVERNMENT IMPOSITION

This Agreement and the performance of all provisions hereof are expressly subject to any present or future laws and to all rules and regulations promulgated by any governmental agency having jurisdiction which may preclude or curtail Seller's right or ability to produce Coal to be delivered hereunder ~~at a reasonable profit~~ or Buyer's right or ability to receive deliveries hereunder.  Provided, however, the terms of this paragraph shall not, in any event, excuse Buyer from the payment for coal already shipped on board a nominated and accepted vessel.

22.    ASSIGNMENT

Seller agrees not to assign or sublet or delegate this contract or any part thereof or any payment to be received hereunder without consent of the Buyer.

23.    NOTIFICATION

All notifications given in relation to this Agreement shall be sent to the addresses below, by prepaid registered airmail, written in English, or by telefacsimile. Notice shall be deemed to be given when such letter or telefacsimile arrives at the address below:

        To Buyer:    Italiana Coke S.p.a.
                     Via Stalingrado 25
                     17014 S. Giuseppe di Cairo
                     Italy
                     Tel.:    +39 019-5067220
                     Fax:    +39 019-5067902
                     E-mail: mat.log@italianacoke.it

        To Seller:    United Coal Company
                      1005 Glenway Avenue
                      Bristol, Virginia  24201 USA

                      Tel. 276-466-3322
                      Fax 276-645-1438
                      E-mail rharing@unitedco.net





8

24.   CAPTIONS

Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.

25.   ENTIRE AGREEMENT

This Agreement contains the entire agreement between the parties and supersedes any and all prior representations, understandings and agreements, oral or written, which are not included herein. This Agreement cannot be altered or amended except by issuance of an addendum signed by authorized representatives of the parties.

IN WITNESS WHEREOF, the parties hereto have caused the Agreement to be executed by their respective officers hereunder duly authorized, as of the day and year first above written.

Buyer:
Italiana Coke S.p.A.

By:_____

Date: 20th June 2006

Seller:
Wellmore Coal Company

By:_____

Date:_____



# Exhibit B

## *SALE AND PURCHASE AGREEMENT*
## *POCAHONTAS LOW VOLATILE COKING COAL*

THIS AGREEMENT made the 12th day of March 2007, where United Coal Company, LLC (SELLER), hereby agrees to sell coal and Italiana Coke S.p.a. (BUYER), agrees to buy coal under the terms and conditions hereinafter set forth.

WITNESSETH:

SELLER agrees to sell and deliver to Buyer and Buyer agrees to accept and pay for coal specified below under the terms and conditions hereinafter set forth:

1.   COMMODITY

Pocahontas Low Volatile Coking Coal from  the Josephine #1, Josephine #2 and Tommy Creek mines owned and operated by Seller.

2.   QUANTITY

30,000 metric tonnes (the "Contract Quantity) +/- 10% at Buyer's option..

3.   DELIVERY OF THE GOODS - REQUEST OF STEMS

Shipments of the Contract Quantity shall be requested by Buyer in increments between 8,000 and 12,000 metric tonnes during the Term, with shipping dates to be mutually agreed with Seller, with both parties acting in good faith to schedule regular deliveries.  Buyer has to request stems in writing at least 45 days prior to the expected loading date for a cargo of coal subject hereto, and Seller has to confirm such proposed stems within five (5) working days from the date of Buyer's request.  In the event Seller fails to confirm stems, the stems shall be considered as confirmed by Seller.

4.   TERM

The Term of this Agreement shall commence on April 1, 2007 and end on March 31, 2008.





2

5. <u>SPECIFICATIONS</u>

The coal delivered hereunder shall be "Pocahontas Low Volatile Coking Coal" and shall conform to the following typical (and guaranteed where indicated) specifications:

| | |
|---|---|
| Moisture (air) | 7.50 % max |
| On dry basis : Volatile Matters (d.b.) | 17.50% max |
| Ash (d.b.) | 7.25% +0.25% max |
| Sulfur (d.b.) | 0.95 % max |
| FSI | 7-9 |
| Arnu -Dilatation | +40 |
| Gieseler (DDPM) | +50 |
| Mean-max reflectance | 1.64 |
| Sizing | 0 X 50mm |

6. <u>DELIVERY</u>

A) Coal shall be delivered hereunder FOBT (stowed and trimmed) vessel at the Norfolk Southern coal loading piers in Norfolk (Hampton Roads), Virginia, U.S.A. (the "Loading Port") with title and risk of loss and damage to the coal passing from Seller to Buyer upon loading into the vessel (as per INCOTERMS 2000).

B) Shipping Terms and Loading Conditions, Norfolk Southern Pier #6

(i)     <u>Loadport</u> - Hampton Roads, Norfolk, Virginia, USA, one good, safe and always acceptable berth.

(ii)     <u>Fixation of Laydays</u> - Buyer to give Seller thirty (30) days notice of fifteen (15) days laycan spread. Seller shall accept or refuse within forty-eight (48) consecutive hours thereafter. Upon nomination, Buyer or its agents shall give the vessel name, details and tonnage to be loaded plus or minus 5%, Buyer's option.

(iii)     <u>Nomination</u> - Buyer or its Agents to nominate the carrying vessel on the basis of a 15-day laycan.

(a) Buyer to give notice of ETA at Loading Port fourteen (14) days prior to the expected ETA of vessel

(b) Ten (10) days prior to the expected ETA at Loading Port, Buyer, or the owner or master of the vessel, to give definite notice of the vessel to be loaded.  Buyer shall be obligated to inform Seller in writing of the

3

final quantity to be loaded no less than ten (10) days before scheduled vessel loading. Further notices to be given 7, 5, 2 and 1 days prior to vessel ETA at Loading Port to confirm vessel arrival schedule at Loading Port.

<u>Loading Terms</u> - According to Norfolk Southern C-5222 Contract Conditions

<u>Agents</u> - Buyer to nominate its own agents at the Loading Port.

<u>Railcar demurrage</u> - Seller will be responsible for any railway car debit demurrage incurred if any cars remain of Seller shipments after completion of the loading of the vessel.

7.    <u>LOADING AND DEMURRAGE</u>

Seller takes the responsibility of having his own coal ready and available at Hampton Roads pier at the time of vessel's loading Date. If Seller fails to meet the specified loading requirements, demurrage shall be paid by Seller to Buyer for time so lost. Demurrage charges shall begin to accrue to Seller's account 24 hours after vessel's schedule loading date and will run until beginning of vessel loading. Vessel's demurrage to be reimbursed to Buyer based on demurrage rate as per governing Charter Party and based on: (a) the proportion of coal delivered by Seller bears to the total tons loaded on the vessel; and (b) the proportion of the number of days the vessel was delayed in loading as a result of Seller's delay in delivery bears to the total number of days of vessel delay.

In the event Norfolk Southern Railroad fails or refuses to supply adequate rail cars to SELLER for loading at the Seller's mines to meet a vessel load date on the grounds that other suppliers being loaded in the same vessel are not mine ready to load, SELLER shall not be liable for demurrage charges to Buyer, provided that SELLER may provide Norfolk Southern records to BUYER proving such situation and relevant responsible supplier(s) in default. In such a case only the non-performing seller(s) shall be held fully responsible for the total amount of vessel's demurrage.

Seller has to officially inform Buyer about exact time of coal arrival at Pier VI in H. Roads.

8.    <u>PRICE</u>

Firm price for the entire Term shall be USD $ 101.30 per metric ton F.O.B.T. vessel Norfolk Southern Pier VI. Fuel surcharge to be calculated each time a specific vessel loads and it will be based upon fuel pricing at that time - up to USD 0.50/metric ton for Seller's account - above USD 0.50/metric ton to be split 50/50 supplier/buyer - according with Railroad documentation.



4

9.    <u>WEIGHT</u>

The weights set forth on the Bills of Lading shall be the Railroad scale weight (Norfolk Southern Pier 6), accepted by both parties hereto as final and binding. The Norfolk Southern Railroad weight certificates shall support these weights.

10.    <u>PAYMENT</u>

Payment shall be made by Buyer to Seller in United States dollars not later than 30 days from the date set forth on the Bill of Lading from the loading vessel. Such payments shall be made by wire transfer to Seller's bank account as stated on the invoice.

11.    <u>SAMPLING AND ANALYSIS</u>

Mechanical sampling and analysis shall be made at the Loading Port, according to applicable ASTM Standards for Sampling and Analysis. The mechanical sampling shall be conducted by the company hired by the Terminal to perform such sampling. The Loading Port analysis shall be determined by an independent, first-class laboratory (the "Independent Laboratory", chosen by Seller and acceptable to Buyer, and the analysis performed by the Independent Laboratory shall be final for calculating the commercial terms for invoicing the value of the Coal sold. The Independent Laboratory shall send promptly by courier one sample (approximately 1 kilo of coal crashed to size below 5 mm) split from the composite sample to Buyer.  The cost for sampling and analysis shall be for Seller's account. Buyer has the right at any time after first notifying Seller to instruct a recognized, independent, first-class laboratory to carry out sampling and analysis at the discharging port. The costs of sampling/analyses performed at discharging port are for Buyer's account. In the event that there should be a substantial difference in quality and quantity results as determined at the Loading and Discharging Ports, Buyer and Seller shall meet to discuss a fair solution.

12.    <u>DOCUMENTATION</u>

SELLER shall provide the following documents to Buyer:

(i)     One original and three copies of Commercial Invoice
(ii)    First, second and third original and three copies non-negotiable Bills of Lading
(iii)   Original and two copies of Certificate of Origin
(iv)    Original and two copies of Railway Weight Certificate
(v)     Original and two copies of Stowage Plan
(vi)    Original and two copies of Statement of Facts
(vii)   Original and two copies of Notice of Readiness
(viii)  Original and two copies of Certificate of Analysis from Independent Laboratory
(ix)    Dump sheet

5

Seller shall promptly render all documentation to Buyer at the following address:

Dott. Stefano Tomisti
Italiana Coke S.p.A.
Via Stalingrado 25
17014 S. Giuseppe di Cairo (Savona)
Italy

13.    <u>PENALTIES</u>

Should the results of the analysis by the Independent Laboratory carried out according to applicable ASTM Standards on each cargo exceed those specifications, penalties shall be assessed to the Seller in the following amounts:

MOISTURE: If moisture content exceeds 7.50% on an "as received" basis, a penalty of 1.0% of the FOBT price shall apply for each 1.0% above 7.50%, fractions pro rata.

ASH: If ash content exceeds 7.50% on a "dry basis", a penalty of 2% of the FOBT price shall apply for each 1.0% above 7.25%, fractions pro rata.

VOLATILE: If volatile content exceeds 17.50% on a "dry basis", a penalty of 1.2% of the FOBT price shall apply for each 1% above 17.50%, fractions pro rata.

SULPHUR: If sulphur content exceeds 0.95% on a "dry basis", a penalty of 2.0% of the FOBT price shall apply for each 0.1% above 0.95%, fractions pro rata.

14.    <u>FORCE MAJEURE</u>

Seller shall not be liable for delay, reduction, or suspension of deliveries resulting from any cause beyond its reasonable control and Buyer shall not be liable for any inability to accept delivery of coal under this Agreement resulting from any cause beyond its reasonable control, provided that Buyer or Seller, as the case may be, shall advise the other party promptly by a written notice describing the situation in detail. Such notice shall be accompanied by documentary evidence if available as to the occurrence of the event and the likely duration thereof and the party claiming force majeure shall promptly exert due diligence to remove such cause. Causes beyond reasonable control of Seller and Buyer shall include, but not be limited to, floods, fires, accidents, strikes, major breakdowns of equipment, shortages of transportation carrier's equipment caused by an event of Force Majeure declared by the transportation carrier, or other reasons, whether of the same or different nature, existing or future, foreseen or unforeseeable, which are beyond the control and without the fault or negligence of the parties hereto but specifically excluding economic factors alone. No suspension or reduction for reason of Force Majeure shall invalidate the remainder of this Contract; but, on removal of the cause, delivery shall resume at the specified date. Deficiencies so caused shall be made up according to what foreseen at the following paragraph 15 concerning" Performance".



6

15. <u>PERFORMANCE</u>

Reliability and regularity in Seller's coal deliveries is an essential item of this Agreement. If for any reason, Seller should (i) fail to deliver any of the cargoes on the dates already confirmed according to paragraph 3 of this Agreement; or (ii) Seller should fail to deliver the quantity at the time required by Buyer from the source set forth in paragraph 1, then in that instance Seller shall deliver coal of a similar quantity and quality from another supplier/mine at the same terms/conditions as per this Agreement after first notifying Buyer within 20 days prior to the expected Loading Date (the "Replacement Coal"). Failing the delivery of suitable Replacement Coal by Seller, only then shall Buyer be entitled to look for and buy other suitable coal on the spot market (Buyer's "Cover Coal"). The price difference, if any, for the Cover Coal shall be for Seller's account. The Buyer in addition to its other rights shall have the right, as its option, to cancel this quantity from the contractual balance or to extend the Term of this Agreement to permit Seller to deliver.

16. <u>GOVERNING LAW</u>

This Agreement shall be governed by and construed in accordance with the law of the State of New York.

17. <u>ARBITRATION</u>

All disputes, controversies or claims between the parties in connection with this Agreement shall be determined by arbitration at New York, N.Y., in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

18. <u>MUTUAL COOPERATION</u>

The parties recognize that circumstances may arise which could not have been foreseen at the time this Agreement was executed. The parties agree that they will use their best efforts to solve any problems due to any such unforeseeable circumstances in the spirit of mutual understanding and in good faith.

19. <u>LIMITATION OF LIABILITY</u>

In no event shall either party be responsible to the other for incidental, special or consequential damages arising out of a default in the performance of any of its covenants or obligations hereunder. Seller's contractual liabilities and Buyer's contractual remedy for coal not in conformance with the specifications of this Agreement shall be limited to the provisions of this Agreement.



7

20.  **DISCLAIMER OF IMPLIED WARRANTIES**

SELLER HEREBY DISCLAIMS, AND BUYER HEREBY WAIVES, ANY AND ALL IMPLIED AND STATUTORY WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND ANY WARRANTIES ARISING FROM ANY COURSE OF DEALING OR USAGE OF TRADE.

21.  **GOVERNMENT IMPOSITION**

This Agreement and the performance of all provisions hereof are expressly subject to any present or future laws and to all rules and regulations promulgated by any governmental agency having jurisdiction which may preclude or curtail Seller's right or ability to produce Coal to be delivered hereunder or Buyer's right or ability to receive deliveries hereunder. Provided, however, the terms of this paragraph shall not, in any event, excuse Buyer from the payment for coal already shipped on board a nominated and accepted vessel.

22.  **ASSIGNMENT**

Seller agrees not to assign or sublet or delegate this contract or any part thereof or any payment to be received hereunder without consent of the Buyer.

23.  **NOTIFICATION**

All notifications given in relation to this Agreement shall be sent to the addresses below, by prepaid registered airmail, written in English, or by telefacsimile. Notice shall be deemed to be given when such letter or telefacsimile arrives at the address below:

To Buyer:     Italiana Coke S.p.a.
              Via Stalingrado 25
              17014 S. Giuseppe di Cairo
              Italy
              Tel.:   +39 019-5067220
              Fax:    +39 019-5067902
              E-mail: mat.log@italianacoke.it

To Seller:    United Coal Company
              1005 Glenway Avenue
              Bristol, Virginia  24201 USA

              Tel. 276-466-3322
              Fax 276-645-1438
              E-mail rharing@unitedco.net

8

24. <u>CAPTIONS</u>

Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.

25. <u>ENTIRE AGREEMENT</u>

This Agreement contains the entire agreement between the parties and supersedes any and all prior representations, understandings and agreements, oral or written, which are not included herein. This Agreement cannot be altered or amended except by issuance of an addendum signed by authorized representatives of the parties.

IN WITNESS WHEREOF, the parties hereto have caused the Agreement to be executed by their respective officers hereunder duly authorized, as of the day and year first above written.

Buyer:
Italiana Coke S.p.A.

By:

Date: March 12th, 2007

Seller:
United Coal Company

By: Ralph Haring
Vice President Sales

Date: April 9th, 2007

## *SALE AND PURCHASE AGREEMENT*
## *WELLMORE HIGH VOLATILE COKING COAL*

THIS AGREEMENT made the 12th day of March 2007, where United Coal Company, LLC (SELLER), hereby agrees to sell coal and Italiana Coke S.p.a. (BUYER), agrees to buy coal under the terms and conditions hereinafter set forth.

### WITNESSETH:

SELLER agrees to sell and deliver to Buyer and Buyer agrees to accept and pay for coal specified below under the terms and conditions hereinafter set forth:

1.  **COMMODITY**

    Freshly mined High-Volatile Coking Coal from  Wellmore #8 mine owned and operated by Seller, Wellmore Coal Company LLC.

2.  **QUANTITY**

    45,000 metric tonnes (the "Contract Quantity) +/- 10% at Buyer's option.

3.  **DELIVERY OF THE GOODS - REQUEST OF STEMS**

    Shipments of the Contract Quantity shall be requested by Buyer in increments between 8,000 and 12,000 metric tonnes during the Term, with shipping dates to be mutually agreed with Seller, with both parties acting in good faith to schedule regular deliveries.  Buyer has to request stems in writing at least 45 days prior to the expected loading date for a cargo of coal subject hereto, and Seller has to confirm such proposed stems within five (5) working days from the date of Buyer's request.  In the event Seller fails to confirm stems, the stems shall be considered as confirmed by Seller.

4.  **TERM**

    The Term of this Agreement shall commence on April 1, 2007 and end on March 31, 2008.





2

5.    <u>SPECIFICATIONS</u>

The coal delivered hereunder shall be "Wellmore High Volatile Coking Coal" and shall conform to the following typical (and guaranteed where indicated) specifications:

| | |
|---|---|
| Moisture (air) | 8.00 % max |
| On dry basis :<br>Volatile Matters (d.b.) | 32.0% max |
| Ash (d.b.) | 7.25% max |
| Sulfur (d.b.) | 0.95 % max |
| FSI | 7-9 |
| Arnu -Dilatation<br>Fluidity<br>Sizing | +240 min<br>25,000 ddpm min<br>0 X 50mm |

6.    <u>DELIVERY</u>

A) Coal shall be delivered hereunder FOBT (stowed and trimmed) vessel at the Norfolk Southern coal loading piers in Norfolk (Hampton Roads), Virginia, U.S.A. (the "Loading Port") with title and risk of loss and damage to the coal passing from Seller to Buyer upon loading into the vessel (as per INCOTERMS 2000).

B) Shipping Terms and Loading Conditions, Norfolk Southern Pier #6

  (i) <u>Loadport</u> - Hampton Roads, Norfolk, Virginia, USA, one good, safe and always acceptable berth.

  (ii) <u>Fixation of Laydays</u> - Buyer to give Seller thirty (30) days notice of fifteen (15) days laycan spread. Seller shall accept or refuse within forty-eight (48) consecutive hours thereafter. Upon nomination, Buyer or its agents shall give the vessel name, details and tonnage to be loaded plus or minus 5%, Buyer's option.

  (iii) <u>Nomination</u> - Buyer or its Agents to nominate the carrying vessel on the basis of a 15-day laycan.

   (a) Buyer to give notice of ETA at Loading Port fourteen (14) days prior to the expected ETA of vessel

   (b) Ten (10) days prior to the expected ETA at Loading Port, Buyer, or the owner or master of the vessel, to give definite notice of the vessel to be loaded. Buyer shall be obligated to inform Seller in writing of the



3

final quantity to be loaded no less than ten (10) days before scheduled vessel loading. Further notices to be given 7, 5, 2 and 1 days prior to vessel ETA at Loading Port to confirm vessel arrival schedule at Loading Port.

Loading Terms - According to Norfolk Southern C-5222 Contract Conditions

Agents - Buyer to nominate its own agents at the Loading Port.

Railcar demurrage - Seller will be responsible for any railway car debit demurrage incurred if any cars remain of Seller shipments after completion of the loading of the vessel.

7.    LOADING AND DEMURRAGE

Seller takes the responsibility of having his own coal ready and available at Hampton Roads pier at the time of vessel's loading Date. If Seller fails to meet the specified loading requirements, demurrage shall be paid by Seller to Buyer for time so lost. Demurrage charges shall begin to accrue to Seller's account 24 hours after vessel's schedule loading date and will run until beginning of vessel loading. Vessel's demurrage to be reimbursed to Buyer based on demurrage rate as per governing Charter Party and based on: (a) the proportion of coal delivered by Seller bears to the total tons loaded on the vessel; and (b) the proportion of the number of days the vessel was delayed in loading as a result of Seller's delay in delivery bears to the total number of days of vessel delay.

In the event Norfolk Southern Railroad fails or refuses to supply adequate rail cars to SELLER for loading at the Seller's mines to meet a vessel load date on the grounds that other suppliers being loaded in the same vessel are not mine ready to load, SELLER shall not be liable for demurrage charges to Buyer, provided that SELLER may provide Norfolk Southern records to BUYER proving such situation and relevant responsible supplier(s) in default. In such a case only the non-performing seller(s) shall be held fully responsible for the total amount of vessel's demurrage.

Seller has to officially inform Buyer about exact time of coal arrival at Pier VI in H. Roads.

8.    PRICE

Firm price for the entire Term shall be USD $ 100.85 per metric ton F.O.B.T. vessel Norfolk Southern Pier VI. Fuel surcharge to be calculated each time a specific vessel loads and it will be based upon fuel pricing at that time - up to USD 0.50/metric ton for Seller's account - above USD 0.50/metric ton to be split 50/50 supplier/buyer - according with Railroad documentation.



4

9. WEIGHT

The weights set forth on the Bills of Lading shall be the Railroad scale weight (Norfolk Southern Pier 6), accepted by both parties hereto as final and binding. The Norfolk Southern Railroad weight certificates shall support these weights.

10. PAYMENT

Payment shall be made by Buyer to Seller in United States dollars not later than 30 days from the date set forth on the Bill of Lading from the loading vessel. Such payments shall be made by wire transfer to Seller's bank account as stated on the invoice.

11. SAMPLING AND ANALYSIS

Mechanical sampling and analysis shall be made at the Loading Port, according to applicable ASTM Standards for Sampling and Analysis. The mechanical sampling shall be conducted by the company hired by the Terminal to perform such sampling. The Loading Port analysis shall be determined by an independent, first-class laboratory (the "Independent Laboratory", chosen by Seller and acceptable to Buyer, and the analysis performed by the Independent Laboratory shall be final for calculating the commercial terms for invoicing the value of the Coal sold. The Independent Laboratory shall send promptly by courier one sample (approximately 1 kilo of coal crashed to size below 5 mm) split from the composite sample to Buyer. The cost for sampling and analysis shall be for Seller's account. Buyer has the right at any time after first notifying Seller to instruct a recognized, independent, first-class laboratory to carry out sampling and analysis at the discharging port. The costs of sampling/analyses performed at discharging port are for Buyer's account. In the event that there should be a substantial difference in quality and quantity results as determined at the Loading and Discharging Ports, Buyer and Seller shall meet to discuss a fair solution.

12. DOCUMENTATION

SELLER shall provide the following documents to Buyer:

(i) One original and three copies of Commercial Invoice
(ii) First, second and third original and three copies non-negotiable Bills of Lading
(iii) Original and two copies of Certificate of Origin
(iv) Original and two copies of Railway Weight Certificate
(v) Original and two copies of Stowage Plan
(vi) Original and two copies of Statement of Facts
(vii) Original and two copies of Notice of Readiness
(viii) Original and two copies of Certificate of Analysis from Independent Laboratory
(ix) Dump sheet



5

Seller shall promptly render all documentation to Buyer at the following address:

Dott. Stefano Tomisti
Italiana Coke S.p.A.
Via Stalingrado 25
17014 S. Giuseppe di Cairo (Savona)
Italy

13.    PENALTIES

Should the results of the analysis by the Independent Laboratory carried out according to applicable ASTM Standards on each cargo exceed those specifications, penalties shall be assessed to the Seller in the following amounts:

MOISTURE:  If moisture content exceeds 8.00% on an "as received" basis, a penalty of 1.0% of the FOBT price shall apply for each 1.0% above 8.00%, fractions pro rata.

ASH:    If ash content exceeds 7.25% on a "dry basis", a penalty of 2.0% of the FOBT price shall apply for each 1.0% above 7.25%, fractions pro rata.

VOLATILE:  If volatile content exceeds 32.00% on a "dry basis", a penalty of 1.2% of the FOBT price shall apply for each 1% above 32.00%, fractions pro rata.

SULPHUR:  If sulphur content exceeds 0.95% on a "dry basis", a penalty of 2.0% of the FOBT price shall apply for each 0.1% above 0.95%, fractions pro rata.

14.    FORCE MAJEURE

Seller shall not be liable for delay, reduction, or suspension of deliveries resulting from any cause beyond its reasonable control and Buyer shall not be liable for any inability to accept delivery of coal under this Agreement resulting from any cause beyond its reasonable control, provided that Buyer or Seller, as the case may be, shall advise the other party promptly by a written notice describing the situation in detail. Such notice shall be accompanied by documentary evidence if available as to the occurrence of the event and the likely duration thereof and the party claiming force majeure shall promptly exert due diligence to remove such cause. Causes beyond reasonable control of Seller and Buyer shall include, but not be limited to, floods, fires, accidents, strikes, major breakdowns of equipment, shortages of transportation carrier's equipment caused by an event of Force Majeure declared by the transportation carrier, or other reasons, whether of the same or different nature, existing or future, foreseen or unforeseeable, which are beyond the control and without the fault or negligence of the parties hereto but specifically excluding economic factors alone. No suspension or reduction for reason of Force Majeure shall invalidate the remainder of this Contract; but, on removal of the cause, delivery shall resume at the specified date. Deficiencies so caused shall be made up according to what foreseen at the following paragraph 15 concerning" Performance".



6

15.    PERFORMANCE

Reliability and regularity in Seller's coal deliveries is an essential item of this Agreement. If for any reason, Seller should (i) fail to deliver any of the cargoes on the dates already confirmed according to paragraph 3 of this Agreement; or (ii) Seller should fail to deliver the quantity at the time required by Buyer from the source set forth in paragraph 1, then in that instance Seller shall deliver coal of a similar quantity and quality from another supplier/mine at the same terms/conditions as per this Agreement after first notifying Buyer within 20 days prior to the expected Loading Date (the "Replacement Coal"). Failing the delivery of suitable Replacement Coal by Seller, only then shall Buyer be entitled to look for and buy other suitable coal on the spot market (Buyer's "Cover Coal"). The price difference, if any, for the Cover Coal shall be for Seller's account. The Buyer in addition to its other rights shall have the right, as its option, to cancel this quantity from the contractual balance or to extend the Term of this Agreement to permit Seller to deliver.

16.    GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the law of the State of New York.

17.    ARBITRATION

All disputes, controversies or claims between the parties in connection with this Agreement shall be determined by arbitration at New York, N.Y., in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

18.    MUTUAL COOPERATION

The parties recognize that circumstances may arise which could not have been foreseen at the time this Agreement was executed. The parties agree that they will use their best efforts to solve any problems due to any such unforeseeable circumstances in the spirit of mutual understanding and in good faith.

19.    LIMITATION OF LIABILITY

In no event shall either party be responsible to the other for incidental, special or consequential damages arising out of a default in the performance of any of its covenants or obligations hereunder. Seller's contractual liabilities and Buyer's contractual remedy for coal not in conformance with the specifications of this Agreement shall be limited to the provisions of this Agreement.



20.   DISCLAIMER OF IMPLIED WARRANTIES

SELLER HEREBY DISCLAIMS, AND BUYER HEREBY WAIVES, ANY AND ALL IMPLIED AND STATUTORY WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND ANY WARRANTIES ARISING FROM ANY COURSE OF DEALING OR USAGE OF TRADE.

21.   GOVERNMENT IMPOSITION

This Agreement and the performance of all provisions hereof are expressly subject to any present or future laws and to all rules and regulations promulgated by any governmental agency having jurisdiction which may preclude or curtail Seller's right or ability to produce Coal to be delivered hereunder or Buyer's right or ability to receive deliveries hereunder. Provided, however, the terms of this paragraph shall not, in any event, excuse Buyer from the payment for coal already shipped on board a nominated and accepted vessel.

22.   ASSIGNMENT

Seller agrees not to assign or sublet or delegate this contract or any part thereof or any payment to be received hereunder without consent of the Buyer.

23.   NOTIFICATION

All notifications given in relation to this Agreement shall be sent to the addresses below, by prepaid registered airmail, written in English, or by telefacsimile. Notice shall be deemed to be given when such letter or telefacsimile arrives at the address below:

        To Buyer:     Italiana Coke S.p.a.
                      Via Stalingrado 25
                      17014 S. Giuseppe di Cairo
                      Italy
                      Tel.:   +39 019-5067220
                      Fax:    +39 019-5067902
                      E-mail: mat.log@italianacoke.it

        To Seller:    United Coal Company
                      1005 Glenway Avenue
                      Bristol, Virginia  24201 USA

                      Tel. 276-466-3322
                      Fax 276-645-1438
                      E-mail rharing@unitedco.net



8

24.   CAPTIONS

Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.

25.   ENTIRE AGREEMENT

This Agreement contains the entire agreement between the parties and supersedes any and all prior representations, understandings and agreements, oral or written, which are not included herein. This Agreement cannot be altered or amended except by issuance of an addendum signed by authorized representatives of the parties.

IN WITNESS WHEREOF, the parties hereto have caused the Agreement to be executed by their respective officers hereunder duly authorized, as of the day and year first above written.

Buyer:
Italiana Coke S.p.A.

By:

Date: March 12th, 2007

Seller:
United Coal Company

By:

Vice President Sales

Date: April 9th, 2007

# Exhibit C



"Info Agenzia
Carboni"
<info@agenziacarboni
.com>

07/12/2007 11.26

Per: <Stefano.Tomisti@italianacoke.it>, "Massimo Busdraghi"
<massimo.busdraghi@italianacoke.it>, "Ralph Haring"
<RHaring@unitedco.net>, "Gary Chilcot"
<GChilcot@unitedco.net>
Cc:
Oggetto: Italiana Coke / United Coal Company

Italiana Coke / United Coal Company
------- -- - -----------------------

Sale and Purchase Agreements 2008/2009
--------------------------------------

Dear All,

With reference to the meeting held in Stockholm on Monday, December 3rd, we
confirm with pleasure the following Terms and Conditions agreed for the contract
year 2008/2009:

Pocahontas Low Volatile Coking Coal
-----------------------------------

Term: April 1st, 2008 - March 31st, 2009

Quantity: 40,000 mt +/- 10% in Buyer's option

Price: USD 135.00/mt FOBT Norfolk Pier 6, plus 50% fuel surcharge as applied by
N&S Railroad

Wellmore High Volatile Coking Coal
-----------------------------------

Term: April 1st, 2008 - March 31st, 2009

Quantity: 40,000 mt +/- 10% in Buyer's option

Price: USD 123.00/mt FOBT Norfolk Pier 6, plus 50% fuel surcharge as applied by
N&S Railroad

All other terms and conditions as per current contracts in force.

Best regards.
Monica Zappalaglio
Agenzia Carboni S.r.l.

# Exhibit D

**Stefano Tomisti**
Inviato da: Antonella
Bono

10/12/2007 12.24

Per: rharing@unitedco.net, gchilcot@unitedco.net,
Info@agenziacarboni.com
Cc: augusto.ascheri@energycoal.com, Massimo
Busdraghi/IC/ICO@ICO
Cc: augusto.ascheri@energycoal.com, Massimo
Busdraghi/IC/ICO@ICO
Oggetto: Italiana Coke / United Coal Company

Dear Sirs,

Following up to our last meeting in Stockholm on December 4, 2007 and subsequent
phone conversation with Monica, we wish to confirm what we agreed:

Wellmore high vol coking coal:
Term: April 1 2008/March 31 2009
Quantity: 40,000 mt +/-10% in Buyer's option
Price: USD 123/MT FOBT Norfolk Pier 6. Fuel surcharge to be calculated as per
existing contract for FY 2007/2008.

Pocahontas low vol coal
Term: April 1 2008/March 31 2009
Quantity: 40,000 mt +/-10% in Buyer's option
Price: USD 135/MT FOBT Norfolk Pier 6. Fuel surcharge to be calculated as per
existing contract for FY 2007/2008.

All other terms/conditions: as per existing contract 2007/2008.

Shipment schedule remaining tonnage 2007/2008
-----------------------------------------------------------------------
We confirm shipping schedule already agreed for first quarter 2008 - balance of 2007/2008
quantity

Thank you for this new business. With our best regards

Stefano Tomisti

# Exhibit E



"Info Agenzia Carboni"
<info@agenziacarboni.com
>
14/04/2008 12.42

Per  <Antonella.Bono@italianacoke.it>

CC  "Italiana Coke" <Mat.Log@italianacoke.it>

CCR

Oggetto  Italiana Coke / United Coal Company


Cara Antonella,

Come d'accordo, ti quoto i messaggi relativi alla variazione della
percentuale di umidità per il Pocahontas con la nostra conferma inviata a
UCC.

Cordiali saluti.
Viviana De Simone
Agenzia Carboni S.r.l.


QUOTE
-------

-----Messaggio originale-----
Da: Info Agenzia Carboni [mailto:info@agenziacarboni.com]
Inviato: martedi 18 dicembre 2007 19.45
A: 'Ralph Haring'
Cc: 'Gary Chilcot'
Oggetto: R: Italiana Coke / United Coal Company


Dear Ralph,

I am pleased to inform you of Italiana Coke's acceptance of the 9% max
guaranteed content on moisture percentage for the Low Vol Pocahontas.

This is in view of a long term and satisfactory relationships between UCC
and Italiana Coke.

We will provide to send you the draft of the contracts for your approval
before sending them to Italiana Coke's acceptance.

Best regards.
Monica Zappalaglio
Agenzia Carboni S.r.l.



-----Messaggio originale-----
Da: Ralph Haring [mailto:RHaring@unitedco.net]
Inviato: venerdi 14 dicembre 2007 20.09
A: Stefano.Tomisti@italianacoke.it
Cc: info@agenziacarboni.com; Gary Chilcot
Oggetto: RE: Italiana Coke / United Coal Company

Dear Stefano,

Sorry for the late reply but I have been traveling at the mines this week
and out of touch with a computer.

As information, UCC has been notified by Pocahontas Coal Co. that because
of
some recent preparation plant modifications they will no longer be using

the
thermal drying units and therefore must request a variance in our
contractual moisture quality.

UCC can confirm your below email with the following exception:

1. Change Pocahontas moisture quality to: 9.0% max.
   All other spec's to remain the same.

As with other U.S. low vol. producers no one at this time is using thermal
dryers... All of our other customers UCC ships to have agreed to this small
variance and look forward to Italiana Coke's acceptance.

Thanks and regards,

Ralph Haring
Vice President of Sales
United Coal Company
1005 Glenway Ave.
Bristol, Virginia    24201
276-645-1424  Tel.
276-645-1438   Fax
423-534-1093   Cell
rharing@unitedco.net   e-mail


-----Original Message-----
From: Antonella.Bono@italianacoke.it
[mailto:Antonella.Bono@italianacoke.it] On Behalf Of
Stefano.Tomisti@italianacoke.it
Sent: Monday, December 10, 2007 6:24 AM
To: Ralph Haring; Gary Chilcot; Info@agenziacarboni.com
Cc: augusto.ascheri@energycoal.com; Massimo.Busdraghi@italianacoke.it
Subject: Italiana Coke / United Coal Company


Dear Sirs,

Following up to our last meeting in Stockholm on December 4, 2007 and
subsequent phone conversation with Monica,  we wish to confirm what we
agreed:

Wellmore high vol coking coal:
Term: April 1 2008/March 31 2009
Quantity: 40,000 mt +/-10% in Buyer's option
Price: USD 123/MT FOBT Norfolk Pier 6. Fuel surcharge to be calculated as
per existing contract for FY 2007/2008.

Pocahontas low vol coal
Term: April 1 2008/March 31 2009
Quantity: 40,000 mt +/-10% in Buyer's option
Price: USD 135/MT FOBT Norfolk Pier 6. Fuel surcharge to be calculated as
per existing contract for FY 2007/2008.

All other terms/condiitions: as per existing contract 2007/2008.


Shipment schedule remaining tonnage 2007/2008
-----------------------------------------------------------------------
---
We confirm shipping schedule already agreed for first quarter 2008 -
balance
of 2007/2008 quantity

Thank you for this new business. With our best regards

Stefano Tomisti

UNQUOTE
---------

# Exhibit F

Stefano Tomisti
Inviato da: Antonella
Bono

14/01/2008 16.39

Per: "Info Agenzia Carboni" <info@agenziacarboni.com>
Cc:
Oggetto: Rif: United Coal - Bozze di contratto carboni Wellmore e
Pocahontas

Cara Viviana,

Ho dato uno squardo ai due draft dei contratti con United.
Confermo che i termini/condizioni riportati sono in accordo con quanto concordato
nell'incontro del 4 dicembre 2007.

In attesa della conferma da parte United Coal, porgo i più cordiali saluti
Antonella


"Info Agenzia Carboni" <info@agenziacarboni.com>




"Info Agenzia
Carboni"
<info@agenziacarboni
.com>

14/01/2008 14.13

Per: <Antonella.Bono@italianacoke.it>
Cc: <Stefano.Tomisti@italianacoke.it>
Oggetto: United Coal - Bozze di contratto carboni Wellmore e
Pocahontas


Cara Antonella,

Come da accordi, Ti trasmetto copia delle bozze dei contratti relativi ai carboni
Wellmore e Pocahontas.
Resto in attesa di tuoi commenti per trasmetterli all'approvazione di United Coal.

Grazie e cordiali saluti.
Viviana De Simone

Agenzia Carboni S.r.l. United - Italiana Coke - Draft Contract Wellmor

United - Italiana Coke - draft contract Pocahontas

*DRAFT*

**SALE AND PURCHASE AGREEMENT**
**WELLMORE HIGH VOLATILE COKING COAL**

THIS AGREEMENT made the 4th day of December 2007, where United Coal Company, LLC (SELLER), hereby agrees to sell coal and Italiana Coke S.p.a. (BUYER), agrees to buy coal under the terms and conditions hereinafter set forth.

WITNESSETH:

SELLER agrees to sell and deliver to Buyer and Buyer agrees to accept and pay for coal specified below under the terms and conditions hereinafter set forth:

1. COMMODITY

   Freshly mined High-Volatile Coking Coal from  Wellmore #8 mine owned and operated by Seller, Wellmore Coal Company LLC.

2. QUANTITY

   40,000 metric tonnes (the "Contract Quantity) +/- 10% at Buyer's option.

3. DELIVERY OF THE GOODS - REQUEST OF STEMS

   Shipments of the Contract Quantity shall be requested by Buyer in increments between 8,000 and 12,000 metric tonnes during the Term, with shipping dates to be mutually agreed with Seller, with both parties acting in good faith to schedule regular deliveries.  Buyer has to request stems in writing at least 45 days prior to the expected loading date for a cargo of coal subject hereto, and Seller has to confirm such proposed stems within five (5) working days from the date of Buyer's request.  In the event Seller fails to confirm stems, the stems shall be considered as confirmed by Seller.

4. TERM

   The Term of this Agreement shall commence on April 1, 2008 and end on March 31, 2009.

5.   <u>SPECIFICATIONS</u>

The coal delivered hereunder shall be "Wellmore High Volatile Coking Coal" and shall conform to the following typical (and guaranteed where indicated) specifications:

| | |
|---|---|
| Moisture (air) | 8.00 % max |
| On dry basis :<br>Volatile Matters (d.b.) | 32.0% max |
| Ash (d.b.) | 7.25% max |
| Sulfur (d.b.) | 0.95 % max |
| FSI | 7-9 |
| Arnu -Dilatation | +240 min |
| Fluidity | 25,000 ddpm min |
| Sizing | 0 X 50mm |

6.   <u>DELIVERY</u>

A) Coal shall be delivered hereunder FOBT (stowed and trimmed) vessel at the Norfolk Southern coal loading piers in Norfolk (Hampton Roads), Virginia, U.S.A. (the "Loading Port") with title and risk of loss and damage to the coal passing from Seller to Buyer upon loading into the vessel (as per INCOTERMS 2000).

B) Shipping Terms and Loading Conditions, Norfolk Southern Pier #6

(i)      <u>Loadport</u> - Hampton Roads, Norfolk, Virginia, USA, one good, safe and always acceptable berth.

(ii)      <u>Fixation of Laydays</u> - Buyer to give Seller thirty (30) days notice of fifteen (15) days laycan spread. Seller shall accept or refuse within forty-eight (48) consecutive hours thereafter. Upon nomination, Buyer or its agents shall give the vessel name, details and tonnage to be loaded plus or minus 5%, Buyer's option.

(iii)      <u>Nomination</u> - Buyer or its Agents to nominate the carrying vessel on the basis of a 15-day laycan.

(a) Buyer to give notice of ETA at Loading Port fourteen (14) days prior to the expected ETA of vessel

(b) Ten (10) days prior to the expected ETA at Loading Port, Buyer, or the owner or master of the vessel, to give definite notice of the vessel to be loaded.  Buyer shall be obligated to inform Seller in writing of the

3

final quantity to be loaded no less than ten (10) days before scheduled vessel loading. Further notices to be given 7, 5, 2 and 1 days prior to vessel ETA at Loading Port to confirm vessel arrival schedule at Loading Port.

Loading Terms - According to Norfolk Southern C-5222 Contract Conditions

Agents - Buyer to nominate its own agents at the Loading Port.

Railcar demurrage - Seller will be responsible for any railway car debit demurrage incurred if any cars remain of Seller shipments after completion of the loading of the vessel.

7.    LOADING AND DEMURRAGE

Seller takes the responsibility of having his own coal ready and available at Hampton Roads pier at the time of vessel's loading Date. If Seller fails to meet the specified loading requirements, demurrage shall be paid by Seller to Buyer for time so lost. Demurrage charges shall begin to accrue to Seller's account 24 hours after vessel's schedule loading date and will run until beginning of vessel loading. Vessel's demurrage to be reimbursed to Buyer based on demurrage rate as per governing Charter Party and based on: (a) the proportion of coal delivered by Seller bears to the total tons loaded on the vessel; and (b) the proportion of the number of days the vessel was delayed in loading as a result of Seller's delay in delivery bears to the total number of days of vessel delay.

In the event Norfolk Southern Railroad fails or refuses to supply adequate rail cars to SELLER for loading at the Seller's mines to meet a vessel load date on the grounds that other suppliers being loaded in the same vessel are not mine ready to load, SELLER shall not be liable for demurrage charges to Buyer, provided that SELLER may provide Norfolk Southern records to BUYER proving such situation and relevant responsible supplier(s) in default. In such a case only the non-performing seller(s) shall be held fully responsible for the total amount of vessel's demurrage.

Seller has to officially inform Buyer about exact time of coal arrival at Pier VI in H. Roads.

8.    PRICE

Firm price for the entire Term shall be USD $ 123.00 per metric ton F.O.B.T. vessel Norfolk Southern Pier VI. Fuel surcharge to be calculated each time a specific vessel loads and it will be based upon fuel pricing at that time - up to USD 0.50/metric ton for Seller's account - above USD 0.50/metric ton to be split 50/50 supplier/buyer - according with Railroad documentation.

4

9.    WEIGHT

The weights set forth on the Bills of Lading shall be the Railroad scale weight (Norfolk Southern Pier 6), accepted by both parties hereto as final and binding. The Norfolk Southern Railroad weight certificates shall support these weights.

10.   PAYMENT

Payment shall be made by Buyer to Seller in United States dollars not later than 30 days from the date set forth on the Bill of Lading from the loading vessel. Such payments shall be made by wire transfer to Seller's bank account as stated on the invoice.

11.   SAMPLING AND ANALYSIS

Mechanical sampling and analysis shall be made at the Loading Port, according to applicable ASTM Standards for Sampling and Analysis. The mechanical sampling shall be conducted by the company hired by the Terminal to perform such sampling. The Loading Port analysis shall be determined by an independent, first-class laboratory (the "Independent Laboratory", chosen by Seller and acceptable to Buyer, and the analysis performed by the Independent Laboratory shall be final for calculating the commercial terms for invoicing the value of the Coal sold. The Independent Laboratory shall send promptly by courier one sample (approximately 1 kilo of coal crashed to size below 5 mm) split from the composite sample to Buyer. The cost for sampling and analysis shall be for Seller's account. Buyer has the right at any time after first notifying Seller to instruct a recognized, independent, first-class laboratory to carry out sampling and analysis at the discharging port. The costs of sampling/analyses performed at discharging port are for Buyer's account. In the event that there should be a substantial difference in quality and quantity results as determined at the Loading and Discharging Ports, Buyer and Seller shall meet to discuss a fair solution.

12.   DOCUMENTATION

SELLER shall provide the following documents to Buyer:

(i)     One original and three copies of Commercial Invoice
(ii)    First, second and third original and three copies non-negotiable Bills of Lading
(iii)   Original and two copies of Certificate of Origin
(iv)    Original and two copies of Railway Weight Certificate
(v)     Original and two copies of Stowage Plan
(vi)    Original and two copies of Statement of Facts
(vii)   Original and two copies of Notice of Readiness
(viii)  Original and two copies of Certificate of Analysis from Independent Laboratory
(ix)    Dump sheet

Seller shall promptly render all documentation to Buyer at the following address:

Dott. Stefano Tomisti
Italiana Coke S.p.A.
Via Stalingrado 25
17014 S. Giuseppe di Cairo  (Savona)
Italy

13.   <u>PENALTIES</u>

Should the results of the analysis by the Independent Laboratory carried out according to applicable ASTM Standards on each cargo exceed those specifications, penalties shall be assessed to the Seller in the following amounts:

MOISTURE:   If moisture content exceeds 8.00% on an "as received" basis, a penalty of 1.0% of the FOBT price shall apply for each 1.0% above 8.00%, fractions pro rata.

ASH:   If ash content exceeds 7.25% on a "dry basis", a penalty of 2.0% of the FOBT price shall apply for each 1.0% above 7.25%, fractions pro rata.

VOLATILE:   If volatile content exceeds 32.00% on a "dry basis", a penalty of 1.2% of the FOBT price shall apply for each 1% above 32.00%, fractions pro rata.

SULPHUR:   If sulphur content exceeds 0.95% on a "dry basis", a penalty of 2.0% of the FOBT price shall apply for each 0.1% above 0.95%, fractions pro rata.

14.   <u>FORCE MAJEURE</u>

Seller shall not be liable for delay, reduction, or suspension of deliveries resulting from any cause beyond its reasonable control and Buyer shall not be liable for any inability to accept delivery of coal under this Agreement resulting from any cause beyond its reasonable control, provided that Buyer or Seller, as the case may be, shall advise the other party promptly by a written notice describing the situation in detail. Such notice shall be accompanied by documentary evidence if available as to the occurrence of the event and the likely duration thereof and the party claiming force majeure shall promptly exert due diligence to remove such cause. Causes beyond reasonable control of Seller and Buyer shall include, but not be limited to, floods, fires, accidents, strikes, major breakdowns of equipment, shortages of transportation carrier's equipment caused by an event of Force Majeure declared by the transportation carrier, or other reasons, whether of the same or different nature, existing or future, foreseen or unforeseeable, which are beyond the control and without the fault or negligence of the parties hereto but specifically excluding economic factors alone. No suspension or reduction for reason of Force Majeure shall invalidate the remainder of this Contract; but, on removal of the cause, delivery shall resume at the specified date. Deficiencies so caused shall be made up according to what foreseen at the following paragraph 15 concerning" Performance".

15.   <u>PERFORMANCE</u>

Reliability and regularity in Seller's coal deliveries is an essential item of this Agreement. If for any reason, Seller should (i) fail to deliver any of the cargoes on the dates already confirmed according to paragraph 3 of this Agreement; or (ii) Seller should fail to deliver the quantity at the time required by Buyer from the source set forth in paragraph 1, then in that instance Seller shall deliver coal of a similar quantity and quality from another supplier/mine at the same terms/conditions as per this Agreement after first notifying Buyer within 20 days prior to the expected Loading Date (the "Replacement Coal"). Failing the delivery of suitable Replacement Coal by Seller, only then shall Buyer be entitled to look for and buy other suitable coal on the spot market (Buyer's "Cover Coal"). The price difference, if any, for the Cover Coal shall be for Seller's account. The Buyer in addition to its other rights shall have the right, as its option, to cancel this quantity from the contractual balance or to extend the Term of this Agreement to permit Seller to deliver.

16.   <u>GOVERNING LAW</u>

This Agreement shall be governed by and construed in accordance with the law of the State of New York.

17.   <u>ARBITRATION</u>

All disputes, controversies or claims between the parties in connection with this Agreement shall be determined by arbitration at New York, N.Y., in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

18.   <u>MUTUAL COOPERATION</u>

The parties recognize that circumstances may arise which could not have been foreseen at the time this Agreement was executed. The parties agree that they will use their best efforts to solve any problems due to any such unforeseeable circumstances in the spirit of mutual understanding and in good faith.

19.   <u>LIMITATION OF LIABILITY</u>

In no event shall either party be responsible to the other for incidental, special or consequential damages arising out of a default in the performance of any of its covenants or obligations hereunder. Seller's contractual liabilities and Buyer's contractual remedy for coal not in conformance with the specifications of this Agreement shall be limited to the provisions of this Agreement.

20.  <u>DISCLAIMER OF IMPLIED WARRANTIES</u>

SELLER HEREBY DISCLAIMS, AND BUYER HEREBY WAIVES, ANY AND ALL IMPLIED AND STATUTORY WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND ANY WARRANTIES ARISING FROM ANY COURSE OF DEALING OR USAGE OF TRADE.

21.  <u>GOVERNMENT IMPOSITION</u>

This Agreement and the performance of all provisions hereof are expressly subject to any present or future laws and to all rules and regulations promulgated by any governmental agency having jurisdiction which may preclude or curtail Seller's right or ability to produce Coal to be delivered hereunder or Buyer's right or ability to receive deliveries hereunder. Provided, however, the terms of this paragraph shall not, in any event, excuse Buyer from the payment for coal already shipped on board a nominated and accepted vessel.

22.  <u>ASSIGNMENT</u>

Seller agrees not to assign or sublet or delegate this contract or any part thereof or any payment to be received hereunder without consent of the Buyer.

23.  <u>NOTIFICATION</u>

All notifications given in relation to this Agreement shall be sent to the addresses below, by prepaid registered airmail, written in English, or by telefacsimile. Notice shall be deemed to be given when such letter or telefacsimile arrives at the address below:

        To Buyer:    Italiana Coke S.p.a.
                     Via Stalingrado 25
                     17014 S. Giuseppe di Cairo
                     Italy
                     Tel.:   +39 019-5067220
                     Fax:    +39 019-5067902
                     E-mail: mat.log@italianacoke.it

        To Seller:   United Coal Company
                     1005 Glenway Avenue
                     Bristol, Virginia  24201 USA

                     Tel. 276-466-3322
                     Fax 276-645-1438
                     E-mail rharing@unitedco.net

8

24.  <u>CAPTIONS</u>

Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.


25.  <u>ENTIRE AGREEMENT</u>

This Agreement contains the entire agreement between the parties and supersedes any and all prior representations, understandings and agreements, oral or written, which are not included herein. This Agreement cannot be altered or amended except by issuance of an addendum signed by authorized representatives of the parties.

IN WITNESS WHEREOF, the parties hereto have caused the Agreement to be executed by their respective officers hereunder duly authorized, as of the day and year first above written.


Buyer:                                    Seller:
Italiana Coke S.p.A.                       United Coal Company

By:_____                 By:_____


Date: December 4th, 2007                   Date:_____

*DRAFT*

***SALE AND PURCHASE AGREEMENT***
***POCAHONTAS LOW VOLATILE COKING COAL***

THIS AGREEMENT made the 4th day of December 2007, where United Coal Company, LLC (SELLER), hereby agrees to sell coal and Italiana Coke S.p.a. (BUYER), agrees to buy coal under the terms and conditions hereinafter set forth.

WITNESSETH:

SELLER agrees to sell and deliver to Buyer and Buyer agrees to accept and pay for coal specified below under the terms and conditions hereinafter set forth:

1.    COMMODITY

Pocahontas Low Volatile Coking Coal from  the Josephine #1, Josephine #2 and Tommy Creek mines owned and operated by Seller.

2.    QUANTITY

40,000 metric tonnes (the "Contract Quantity) +/- 10% at Buyer's option..

3.    DELIVERY OF THE GOODS - REQUEST OF STEMS

Shipments of the Contract Quantity shall be requested by Buyer in increments between 8,000 and 12,000 metric tonnes during the Term, with shipping dates to be mutually agreed with Seller, with both parties acting in good faith to schedule regular deliveries.  Buyer has to request stems in writing at least 45 days prior to the expected loading date for a cargo of coal subject hereto, and Seller has to confirm such proposed stems within five (5) working days from the date of Buyer's request.  In the event Seller fails to confirm stems, the stems shall be considered as confirmed by Seller.

4.    TERM

The Term of this Agreement shall commence on April 1, 2008 and end on March 31, 2009.

5.    <u>SPECIFICATIONS</u>

The coal delivered hereunder shall be "Pocahontas Low Volatile Coking Coal" and shall conform to the following typical (and guaranteed where indicated) specifications:

| | |
|---|---|
| Moisture (air) | 9.00 % max |
| On dry basis :<br>Volatile Matters (d.b.) | 17.50% max |
| Ash (d.b.) | 7.25% +0.25% max |
| Sulfur (d.b.) | 0.95 % max |
| FSI | 7-9 |
| Arnu -Dilatation | +40 |
| Gieseler (DDPM) | +50 |
| Mean-max reflectance | 1.64 |
| Sizing | 0 X 50mm |

6.    <u>DELIVERY</u>

A) Coal shall be delivered hereunder FOBT (stowed and trimmed) vessel at the Norfolk Southern coal loading piers in Norfolk (Hampton Roads), Virginia, U.S.A. (the "Loading Port") with title and risk of loss and damage to the coal passing from Seller to Buyer upon loading into the vessel (as per INCOTERMS 2000).

B) Shipping Terms and Loading Conditions, Norfolk Southern Pier #6

      (i)     <u>Loadport</u> - Hampton Roads, Norfolk, Virginia, USA, one good, safe and always acceptable berth.

      (ii)     <u>Fixation of Laydays</u> - Buyer to give Seller thirty (30) days notice of fifteen (15) days laycan spread. Seller shall accept or refuse within forty-eight (48) consecutive hours thereafter. Upon nomination, Buyer or its agents shall give the vessel name, details and tonnage to be loaded plus or minus 5%, Buyer's option.

      (iii)     <u>Nomination</u> - Buyer or its Agents to nominate the carrying vessel on the basis of a 15-day laycan.

            (a) Buyer to give notice of ETA at Loading Port fourteen (14) days prior to the expected ETA of vessel

            (b) Ten (10) days prior to the expected ETA at Loading Port, Buyer, or the owner or master of the vessel, to give definite notice of the vessel to be loaded. Buyer shall be obligated to inform Seller in writing of the

final quantity to be loaded no less than ten (10) days before scheduled vessel loading. Further notices to be given 7, 5, 2 and 1 days prior to vessel ETA at Loading Port to confirm vessel arrival schedule at Loading Port.

<u>Loading Terms</u> - According to Norfolk Southern C-5222 Contract Conditions

<u>Agents</u> - Buyer to nominate its own agents at the Loading Port.

<u>Railcar demurrage</u> - Seller will be responsible for any railway car debit demurrage incurred if any cars remain of Seller shipments after completion of the loading of the vessel.

7.     <u>LOADING AND DEMURRAGE</u>

Seller takes the responsibility of having his own coal ready and available at Hampton Roads pier at the time of vessel's loading Date. If Seller fails to meet the specified loading requirements, demurrage shall be paid by Seller to Buyer for time so lost. Demurrage charges shall begin to accrue to Seller's account 24 hours after vessel's schedule loading date and will run until beginning of vessel loading. Vessel's demurrage to be reimbursed to Buyer based on demurrage rate as per governing Charter Party and based on: (a) the proportion of coal delivered by Seller bears to the total tons loaded on the vessel; and (b) the proportion of the number of days the vessel was delayed in loading as a result of Seller's delay in delivery bears to the total number of days of vessel delay.

In the event Norfolk Southern Railroad fails or refuses to supply adequate rail cars to SELLER for loading at the Seller's mines to meet a vessel load date on the grounds that other suppliers being loaded in the same vessel are not mine ready to load, SELLER shall not be liable for demurrage charges to Buyer, provided that SELLER may provide Norfolk Southern records to BUYER proving such situation and relevant responsible supplier(s) in default. In such a case only the non-performing seller(s) shall be held fully responsible for the total amount of vessel's demurrage.

Seller has to officially inform Buyer about exact time of coal arrival at Pier VI in H. Roads.

8.     <u>PRICE</u>

Firm price for the entire Term shall be USD $ 135.00 per metric ton F.O.B.T. vessel Norfolk Southern Pier VI. Fuel surcharge to be calculated each time a specific vessel loads and it will be based upon fuel pricing at that time - up to USD 0.50/metric ton for Seller's account - above USD 0.50/metric ton to be split 50/50 supplier/buyer - according with Railroad documentation.

9.   WEIGHT

The weights set forth on the Bills of Lading shall be the Railroad scale weight (Norfolk Southern Pier 6), accepted by both parties hereto as final and binding. The Norfolk Southern Railroad weight certificates shall support these weights.

10.   PAYMENT

Payment shall be made by Buyer to Seller in United States dollars not later than 30 days from the date set forth on the Bill of Lading from the loading vessel. Such payments shall be made by wire transfer to Seller's bank account as stated on the invoice.

11.   SAMPLING AND ANALYSIS

Mechanical sampling and analysis shall be made at the Loading Port, according to applicable ASTM Standards for Sampling and Analysis. The mechanical sampling shall be conducted by the company hired by the Terminal to perform such sampling. The Loading Port analysis shall be determined by an independent, first-class laboratory (the "Independent Laboratory", chosen by Seller and acceptable to Buyer, and the analysis performed by the Independent Laboratory shall be final for calculating the commercial terms for invoicing the value of the Coal sold. The Independent Laboratory shall send promptly by courier one sample (approximately 1 kilo of coal crashed to size below 5 mm) split from the composite sample to Buyer.   The cost for sampling and analysis shall be for Seller's account. Buyer has the right at any time after first notifying Seller to instruct a recognized, independent, first-class laboratory to carry out sampling and analysis at the discharging port. The costs of sampling/analyses performed at discharging port are for Buyer's account. In the event that there should be a substantial difference in quality and quantity results as determined at the Loading and Discharging Ports, Buyer and Seller shall meet to discuss a fair solution.

12.   DOCUMENTATION

SELLER shall provide the following documents to Buyer:

(i)     One original and three copies of Commercial Invoice
(ii)    First, second and third original and three copies non-negotiable Bills of Lading
(iii)   Original and two copies of Certificate of Origin
(iv)    Original and two copies of Railway Weight Certificate
(v)     Original and two copies of Stowage Plan
(vi)    Original and two copies of Statement of Facts
(vii)   Original and two copies of Notice of Readiness
(viii)  Original and two copies of Certificate of Analysis from Independent Laboratory
(ix)    Dump sheet

Seller shall promptly render all documentation to Buyer at the following address:

Dott. Stefano Tomisti
Italiana Coke S.p.A.
Via Stalingrado 25
17014 S. Giuseppe di Cairo  (Savona)
Italy

13.    <u>PENALTIES</u>

Should the results of the analysis by the Independent Laboratory carried out according to applicable ASTM Standards on each cargo exceed those specifications, penalties shall be assessed to the Seller in the following amounts:

MOISTURE:  If moisture content exceeds 9.00% on an "as received" basis, a penalty of 1.0% of the FOBT price shall apply for each 1.0% above 9.00%, fractions pro rata.

ASH:          If ash content exceeds 7.50% on a "dry basis", a penalty of 2% of the FOBT price shall apply for each 1.0% above 7.25%, fractions pro rata.

VOLATILE:  If volatile content exceeds 17.50% on a "dry basis", a penalty of 1.2% of the FOBT price shall apply for each 1% above 17.50%, fractions pro rata.

SULPHUR:   If sulphur content exceeds 0.95% on a "dry basis", a penalty of 2.0% of the FOBT price shall apply for each 0.1% above 0.95%, fractions pro rata.

14.    <u>FORCE MAJEURE</u>

Seller shall not be liable for delay, reduction, or suspension of deliveries resulting from any cause beyond its reasonable control and Buyer shall not be liable for any inability to accept delivery of coal under this Agreement resulting from any cause beyond its reasonable control, provided that Buyer or Seller, as the case may be, shall advise the other party promptly by a written notice describing the situation in detail. Such notice shall be accompanied by documentary evidence if available as to the occurrence of the event and the likely duration thereof and the party claiming force majeure shall promptly exert due diligence to remove such cause. Causes beyond reasonable control of Seller and Buyer shall include, but not be limited to, floods, fires, accidents, strikes, major breakdowns of equipment, shortages of transportation carrier's equipment caused by an event of Force Majeure declared by the transportation carrier, or other reasons, whether of the same or different nature, existing or future, foreseen or unforeseeable, which are beyond the control and without the fault or negligence of the parties hereto but specifically excluding economic factors alone. No suspension or reduction for reason of Force Majeure shall invalidate the remainder of this Contract; but, on removal of the cause, delivery shall resume at the specified date. Deficiencies so caused shall be made up according to what foreseen at the following paragraph 15 concerning" Performance".

6

15.    <u>PERFORMANCE</u>

Reliability and regularity in Seller's coal deliveries is an essential item of this Agreement. If for any reason, Seller should (i) fail to deliver any of the cargoes on the dates already confirmed according to paragraph 3 of this Agreement; or (ii) Seller should fail to deliver the quantity at the time required by Buyer from the source set forth in paragraph 1, then in that instance Seller shall deliver coal of a similar quantity and quality from another supplier/mine at the same terms/conditions as per this Agreement after first notifying Buyer within 20 days prior to the expected Loading Date (the "Replacement Coal"). Failing the delivery of suitable Replacement Coal by Seller, only then shall Buyer be entitled to look for and buy other suitable coal on the spot market (Buyer's "Cover Coal"). The price difference, if any, for the Cover Coal shall be for Seller's account. The Buyer in addition to its other rights shall have the right, as its option, to cancel this quantity from the contractual balance or to extend the Term of this Agreement to permit Seller to deliver.

16.    <u>GOVERNING LAW</u>

This Agreement shall be governed by and construed in accordance with the law of the State of New York.

17.    <u>ARBITRATION</u>

All disputes, controversies or claims between the parties in connection with this Agreement shall be determined by arbitration at New York, N.Y., in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

18.    <u>MUTUAL COOPERATION</u>

The parties recognize that circumstances may arise which could not have been foreseen at the time this Agreement was executed. The parties agree that they will use their best efforts to solve any problems due to any such unforeseeable circumstances in the spirit of mutual understanding and in good faith.

19.    <u>LIMITATION OF LIABILITY</u>

In no event shall either party be responsible to the other for incidental, special or consequential damages arising out of a default in the performance of any of its covenants or obligations hereunder. Seller's contractual liabilities and Buyer's contractual remedy for coal not in conformance with the specifications of this Agreement shall be limited to the provisions of this Agreement.

20.  **DISCLAIMER OF IMPLIED WARRANTIES**

SELLER HEREBY DISCLAIMS, AND BUYER HEREBY WAIVES, ANY AND ALL IMPLIED AND STATUTORY WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND ANY WARRANTIES ARISING FROM ANY COURSE OF DEALING OR USAGE OF TRADE.

21.  **GOVERNMENT IMPOSITION**

This Agreement and the performance of all provisions hereof are expressly subject to any present or future laws and to all rules and regulations promulgated by any governmental agency having jurisdiction which may preclude or curtail Seller's right or ability to produce Coal to be delivered hereunder or Buyer's right or ability to receive deliveries hereunder. Provided, however, the terms of this paragraph shall not, in any event, excuse Buyer from the payment for coal already shipped on board a nominated and accepted vessel.

22.  **ASSIGNMENT**

Seller agrees not to assign or sublet or delegate this contract or any part thereof or any payment to be received hereunder without consent of the Buyer.

23.  **NOTIFICATION**

All notifications given in relation to this Agreement shall be sent to the addresses below, by prepaid registered airmail, written in English, or by telefacsimile. Notice shall be deemed to be given when such letter or telefacsimile arrives at the address below:

    To Buyer:    Italiana Coke S.p.a.
                 Via Stalingrado 25
                 17014 S. Giuseppe di Cairo
                 Italy
                 Tel.:   +39 019-5067220
                 Fax:    +39 019-5067902
                 E-mail: mat.log@italianacoke.it

    To Seller:   United Coal Company
                 1005 Glenway Avenue
                 Bristol, Virginia  24201 USA

                 Tel. 276-466-3322
                 Fax 276-645-1438
                 E-mail rharing@unitedco.net

24.    <u>CAPTIONS</u>

Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.


25.    <u>ENTIRE AGREEMENT</u>

This Agreement contains the entire agreement between the parties and supersedes any and all prior representations, understandings and agreements, oral or written, which are not included herein. This Agreement cannot be altered or amended except by issuance of an addendum signed by authorized representatives of the parties.

IN WITNESS WHEREOF, the parties hereto have caused the Agreement to be executed by their respective officers hereunder duly authorized, as of the day and year first above written.


Buyer:                                         Seller:
Italiana Coke S.p.A.                           United Coal Company

By:_____        By:_____


Date: December 4th, 2007              Date:_____

# Exhibit G



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Hyojin Park , hereby certify that the following is, to the best of my knowledge and belief, a true and accurate translation of the document: "Emails, dated January 14, 2008, between Viviana De Simone of Agenzia Carboni and Antonella Bono and Stefano Tomisti of Italiana Coke, attaching draft contracts" from Italian into English.

_____
Signature

Sworn to before me this
July 15th, 2008

_____
Signature, Notary Public

Pamela Boyle
Notary Public, State of New York
No. 01BO6181278
Qualified in NEW YORK County
Commission Expires Jan 28, 2010

_____
Stamp, Notary Public

**Stefano Tomisti**
Sent by: Antonella
Bono

1/14/2008, 4:39 PM

To: "Coal Agency Info" <info@agenziacarboni.com>
Cc:
Subject: Ref.: United Coal - Drafts of Wellmore and Pocahontas coal contract

Dear Viviana,

I have had a look at the two drafts of the contracts with United.
I confirm that the terms/conditions reported are in line with what was agreed at the meeting on December 4, 2007.

We are waiting for confirmation from United Coal.
Yours sincerely,
Antonella

"Coal Agency Info" <info@agenziacarboni.com>

[logo]
**"Coal Agency Info"**
**<info@agenziacarboni.com>**

1/14/2008, 2:13 PM

To: <Antonella.Bono@italianacoke.it>
Cc: Stefano.Tomisti@italianacoke.it>
Subject: United Coal - Drafts of Wellmore and Pocahontas coal contract

Dear Antonella,

As agreed, I am sending you copies of the drafts of the contracts relative to Wellmore and Pocahontas coals.
I will wait for your comments to send them for the approval of United Coal.

Thanks
Yours sincerely,
Viviana De Simone

Agenzia Carboni S.r.l.

[Attachment: United - Italiana Coke - Draft Contract Wellmore]

[Attachment: United - Italiana Coke - draft contract Pocahontas]

# Exhibit H

Cc: "Gary Chilcot" <GChilcot@unitedco.net>,
<info@agenziacarboni.com>, "Reba Lawson"
<RLawson@unitedco.net>
Oggetto: RE: Italiana Coke Shipments and new agreement 2008/2009

Dear Stefano,

Thanks for your prompt reply. Your schedule sounds workable but will
need to re-confirm from the mines but don't see a problem
Thanks again for your understanding and flexibility.

Kind regards,

Ralph


Ralph Haring
Vice President Sales
United Coal Company
1005 Glenway Avenue
Bristol, Virginia  24201
Tel.   276-645-1424
Cell   423-534-1093
Fax    276-645-1438
email rharing@unitedco.net

-----Original Message-----
From: Antonella.Bono@italianacoke.it
[mailto:Antonella.Bono@italianacoke.it] On Behalf Of
Stefano.Tomisti@italianacoke.it
Sent: Tuesday, March 04, 2008 12:01 PM
To: Ralph Haring
Cc: Gary Chilcot; info@agenziacarboni.com; Reba Lawson
Subject: Rif: Italiana Coke Shipments and new agreement 2008/2009


Dear Ralph,

We understand your problems with Wellmore and Pocahontas mines and we
are
well
aware of your support in order to deliver your coal for our February and
March
2008 ships.  For that reason we renounce to the stem requested for our
May
ship.

I can propose you to load one hold of high vol coal and one hold of low
vol
coal in
the second half of June 2008.  This delivery can allow us to jump to
first
days of
November 2008 with next delivery of Wellmore coal and will allow you to
get
round
your difficulties.

For what concerns Pocahontas coal, our needs are a second hold in the
first
half of
August and a third one in the second half of December 2008.

I trust this can be a good solution for both UCC and IC.
Looking forward to receiving your news, I thank you very much in
advance.

Stefano Tomisti

"Ralph Haring"

&lt;RHaring@unitedc                Per:
&lt;Stefano.Tomisti@italianacoke.it&gt;,
              o.net&gt;                &lt;info@agenziacarboni.com&gt;

                                     Cc:      "Gary Chilcot"
&lt;GChilcot@unitedco.net&gt;, "Reba
              04/03/2008 15.19       Lawson"
&lt;RLawson@unitedco.net&gt;
                                     Oggetto: Italiana Coke
Shipments

Dear Stefano and Monica,

 UCC regrets to inform you/Italiana Coke that UCC will not be able to load
any coal in May of 2008. We continue to experience mining difficulties with
our Wellmore and Pocahontas mines. We have been protecting Italiana Coke's
vessels and now are in serious problems with other customers as our
production continues to fall. Wellmore had deficit production of over
30,000 tons for last two months and Pocahontas is worse. The good and the
bad of it all is that we do see some recovery of Pocahontas production in
the near future but Wellmore production might not recover for a long time.
Therefore, we are notifying Italiana Coke that their earlier shipments of
Wellmore on next year's business might fall behind for the next several
months.

UCC regrets any inconvenience this might cause Italiana Coke and assure you
that we are doing everything we can to correct our production short fall at
both Wellmore and Pocahontas mines.

Thanking you for your understanding.

Best regards,

Ralph


Ralph Haring
Vice President Sales
United Coal Company

1005 Glenway Avenue
Bristol, Virginia  24201
Tel.   276-645-1424
Cell   423-534-1093
Fax    276-645-1438
email rharing@unitedco.net

# Exhibit I



"Ralph Haring"
<RHaring@unitedco.ne
t>

06/03/2008 23.46

Per: <Stefano.Tomisti@italianacoke.it>
Cc: "Gary Chilcot" <GChilcot@unitedco.net>, <agenziacarboni@tin.it>,
     "Reba Lawson" <RLawson@unitedco.net>
Oggetto: RE: RE: Italiana Coke/ Wellmore Shipments

# URGENTE

Dear Stefano

UCC is having a major problem with our Wellmore operations and will not
have the production to meet the vessel tonnage scheduled for March 28th.
Details will follow in case of force majeure situation but definitely could
effect the vessels loading. Please advise if Italiana Coke is in a position
to take a hold of Pocahontas coal to replace Wellmore?... We are not sure
if this works for UCC or I-C but are exploring every possibility to help
protect the vessel.. Please advise at your earliest I-C position.

Best regards,

Ralph Haring
Vice President Sales
United Coal Company
1005 Glenway Avenue
Bristol, Virginia  24201
Tel.  276-645-1424
Cell  423-534-1093
Fax   276-645-1438
email rharing@unitedco.net

-----Original Message-----
From: Antonella.Bono@italianacoke.it
[mailto:Antonella.Bono@italianacoke.it] On Behalf Of
Stefano.Tomisti@italianacoke.it
Sent: Thursday, March 06, 2008 9:41 AM
To: Ralph Haring
Subject: Rif: RE: Italiana Coke Shipments and new agreement 2008/2009


Dear Ralph,

Thanks for your message. The shipping schedule I proposed to you is the
maximum
we can do. I am waiting for your final re-confirmation as soon as you can
as I have
to complete our production plan for the next few months and adjust
remaining stem
request to other suppliers.
Thanks again.
With my best regards
Stefano

"Ralph Haring"

                                                                               <RHaring@unitedc           Per:

<Stefano.Tomisti@italianacoke.it>
                                       o.net>               Cc:      "Gary Chilcot"

<GChilcot@unitedco.net>,

                                                  <info@agenziacarboni.com>,

"Reba Lawson"

                             04/03/2008 18.52      <RLawson@unitedco.net>

                                              Oggetto: RE: Italiana Coke

Shipments and new agreement

                                              2008/2009

Dear Stefano,

Thanks for your prompt reply. Your schedule sounds workable but will
need to re-confirm from the mines but don't see a problem
Thanks again for your understanding and flexibility.

Kind regards,

Ralph


Ralph Haring
Vice President Sales
United Coal Company
1005 Glenway Avenue
Bristol, Virginia  24201
Tel.   276-645-1424
Cell   423-534-1093
Fax    276-645-1438
email rharing@unitedco.net

-----Original Message-----
From: Antonella.Bono@italianacoke.it
[mailto:Antonella.Bono@italianacoke.it] On Behalf Of
Stefano.Tomisti@italianacoke.it
Sent: Tuesday, March 04, 2008 12:01 PM
To: Ralph Haring
Cc: Gary Chilcot; info@agenziacarboni.com; Reba Lawson
Subject: Rif: Italiana Coke Shipments and new agreement 2008/2009


Dear Ralph,

We understand your problems with Wellmore and Pocahontas mines and we
are
well
aware of your support in order to deliver your coal for our February and
March
2008 ships.  For that reason we renounce to the stem requested for our
May
ship.

I can propose you to load one hold of high vol coal and one hold of low

vol
coal in
the second half of June 2008.  This delivery can allow us to jump to
first
days of
November 2008 with next delivery of Wellmore coal and will allow you to
get
round
your difficulties.

For what concerns Pocahontas coal, our needs are a second hold in the
first
half of
August and a third one in the second half of December 2008.

I trust this can be a good solution for both UCC and IC.
Looking forward to receiving your news, I thank you very much in
advance.

Stefano Tomisti

| | "Ralph Haring" | |
|---|---|---|
| | &lt;RHaring@unitedc | Per: |
| &lt;Stefano.Tomisti@italianacoke.it&gt;, | | |
| | o.net&gt; | &lt;info@agenziacarboni.com&gt; |
| | | Cc:     "Gary Chilcot" |
| &lt;GChilcot@unitedco.net&gt;, "Reba | | |
| | 04/03/2008 15.19 | Lawson" |
| &lt;RLawson@unitedco.net&gt; | | |
| | | Oggetto: Italiana Coke |
| Shipments | | |

Dear Stefano and Monica,

 UCC regrets to inform you/Italiana Coke that UCC will not be able to
load
any coal in May of 2008. We continue to experience mining difficulties
with
our Wellmore and Pocahontas mines. We have been protecting Italiana
Coke's
vessels and now are in serious problems with other customers as our
production continues to fall. Wellmore had deficit production of over
30,000 tons for last two months and Pocahontas is worse. The good and
the
bad of it all is that we do see some recovery of Pocahontas production
in
the near future but Wellmore production might not recover for a long
time.
Therefore, we are notifying Italiana Coke that their earlier shipments
of

Wellmore on next year's business might fall behind for the next several months.

UCC regrets any inconvenience this might cause Italiana Coke and assure you that we are doing everything we can to correct our production short fall at both Wellmore and Pocahontas mines.

Thanking you for your understanding.

Best regards,

Ralph


Ralph Haring
Vice President Sales
United Coal Company
1005 Glenway Avenue
Bristol, Virginia  24201
Tel.   276-645-1424
Cell   423-534-1093
Fax    276-645-1438
email rharing@unitedco.net

# Exhibit J

| | |
|---|---|
| **Stefano Tomisti** | Per: "Ralph Haring" <RHaring@unitedco.net> |
| Inviato da: Antonella | Cc: gchilcot@unitedco.net, Info@agenziacarboni.com, |
| Bono | rlawson@unitedco.net |
| | Cc: gchilcot@unitedco.net, Info@agenziacarboni.com, |
| 07/03/2008 12.58 | rlawson@unitedco.net |
| | Oggetto: Rif: RE: RE: Italiana Coke/ Wellmore Shipments |

V E R Y   U R G E N T

Dear Ralph,

... and now we really got bogged down!!

Now it is too late.   It would be unimaginable only to think at the possibility to find an alternative high vol coal on the spot market.

That being said, at the time being we can only try to find a solution in order to avoid  not only further discussions but also heavy financial and production problems

This new proposal modifies once again what we had already agreed two days ago but I need absolutely your **final acceptance within today**  as I have to make a re-scheduling of our production plan for the next  few  months and a re-adjustment of our shipping plans.

- L/D March 28 : we can accept to stubstitute the lacking quantity of Wellmore coal with equal
                    quantity of Pocahontas coal. That way two holds of Pocahontas coal will be
                    loaded on the vessel.

April / May 2008: no delivery

June 15-30 2008: 8/10,000 mtons of Wellmore coal
                      no quantity of Pocahontas coal (as per previous shipping schedule)

August 1-15, 2008: 8/10,000 mtons of Pocahontas coal

September/October 2008 : no delivery

November 2008: 8/10,000 mtons of Wellmore coal

December 2008: 8/10,000 mtons of Pocahontas coal


These are the minimum quantities that Italiana Coke needs just to survive and this shipping schedule has to be considered as final.

I am looking forward to receiving your URGENT news.

With my best regards
Stefano

P.S.: Massimo and I are planning a trip to U.S.A. and we would like to pay a visit to you.
We shall revert as soon as we have a final trip program.


"Ralph Haring" <RHaring@unitedco.net>



| | |
|---|---|
| **"Ralph Haring"** | Per: <Stefano.Tomisti@italianacoke.it> |
| **<RHaring@unitedco.ne** | Cc: "Gary Chilcot" <GChilcot@unitedco.net>, <agenziacarboni@tin.it>, |
| **t>** | "Reba Lawson" <RLawson@unitedco.net> |

 06/03/2008 23.46    Oggetto:  RE: RE: Italiana Coke/ Wellmore Shipments

# URGENTE

Dear Stefano

UCC is having a major problem with our Wellmore operations and will not
have the production to meet the vessel tonnage scheduled for March 28th.
Details will follow in case of force majeure situation but definitely could
effect the vessels loading. Please advise if Italiana Coke is in a position
to take a hold of Pocahontas coal to replace Wellmore?... We are not sure
if this works for UCC or I-C but are exploring every possibility to help
protect the vessel.. Please advise at your earliest I-C position.

Best regards,

Ralph Haring
Vice President Sales
United Coal Company
1005 Glenway Avenue
Bristol, Virginia  24201
Tel.  276-645-1424
Cell  423-534-1093
Fax   276-645-1438
email rharing@unitedco.net

-----Original Message-----
From: Antonella.Bono@italianacoke.it
[mailto:Antonella.Bono@italianacoke.it] On Behalf Of
Stefano.Tomisti@italianacoke.it
Sent: Thursday, March 06, 2008 9:41 AM
To: Ralph Haring
Subject: Rif: RE: Italiana Coke Shipments and new agreement 2008/2009


Dear Ralph,

Thanks for your message. The shipping schedule I proposed to you is the
maximum
we can do. I am waiting for your final re-confirmation as soon as you can
as I have
to complete our production plan for the next few months and adjust
remaining stem
request to other suppliers.
Thanks again.
With my best regards
Stefano




                     "Ralph Haring"

```
                    <RHaring@unitedc        Per:
<Stefano.Tomisti@italianacoke.it>
                    o.net>                  Cc:      "Gary Chilcot"
<GChilcot@unitedco.net>,
                                            <info@agenziacarboni.com>,
"Reba Lawson"
                    04/03/2008 18.52        <RLawson@unitedco.net>

                                            Oggetto: RE: Italiana Coke
Shipments and new agreement
                                            2008/2009
```

Dear Stefano,

Thanks for your prompt reply. Your schedule sounds workable but will
need to re-confirm from the mines but don't see a problem
Thanks again for your understanding and flexibility.

Kind regards,

Ralph


Ralph Haring
Vice President Sales
United Coal Company
1005 Glenway Avenue
Bristol, Virginia  24201
Tel.  276-645-1424
Cell  423-534-1093
Fax   276-645-1438
email rharing@unitedco.net

-----Original Message-----
From: Antonella.Bono@italianacoke.it
[mailto:Antonella.Bono@italianacoke.it] On Behalf Of
Stefano.Tomisti@italianacoke.it
Sent: Tuesday, March 04, 2008 12:01 PM
To: Ralph Haring
Cc: Gary Chilcot; info@agenziacarboni.com; Reba Lawson
Subject: Rif: Italiana Coke Shipments and new agreement 2008/2009


Dear Ralph,

We understand your problems with Wellmore and Pocahontas mines and we
are
well
aware of your support in order to deliver your coal for our February and
March
2008 ships.  For that reason we renounce to the stem requested for our
May
ship.

I can propose you to load one hold of high vol coal and one hold of low
vol
coal in

the second half of June 2008.  This delivery can allow us to jump to
first
days of
November 2008 with next delivery of Wellmore coal and will allow you to
get
round
your difficulties.

For what concerns Pocahontas coal, our needs are a second hold in the
first
half of
August and a third one in the second half of December 2008.

I trust this can be a good solution for both UCC and IC.
Looking forward to receiving your news, I thank you very much in
advance.

Stefano Tomisti




                       "Ralph Haring"

                              <RHaring@unitedc        Per:
<Stefano.Tomisti@italianacoke.it>,
                       o.net>                         <info@agenziacarboni.com>

                                                      Cc:      "Gary Chilcot"
<GChilcot@unitedco.net>, "Reba
                       04/03/2008 15.19               Lawson"
<RLawson@unitedco.net>

                                                      Oggetto: Italiana Coke
Shipments




Dear Stefano and Monica,

 UCC regrets to inform you/Italiana Coke that UCC will not be able to
load
any coal in May of 2008. We continue to experience mining difficulties
with
our Wellmore and Pocahontas mines. We have been protecting Italiana
Coke's
vessels and now are in serious problems with other customers as our
production continues to fall. Wellmore had deficit production of over
30,000 tons for last two months and Pocahontas is worse. The good and
the
bad of it all is that we do see some recovery of Pocahontas production
in
the near future but Wellmore production might not recover for a long
time.
Therefore, we are notifying Italiana Coke that their earlier shipments
of
Wellmore on next year's business might fall behind for the next several
months.

UCC regrets any inconvenience this might cause Italiana Coke and assure you
that we are doing everything we can to correct our production short fall at
both Wellmore and Pocahontas mines.

Thanking you for your understanding.

Best regards,

Ralph


Ralph Haring
Vice President Sales
United Coal Company
1005 Glenway Avenue
Bristol, Virginia  24201
Tel.   276-645-1424
Cell   423-534-1093
Fax   276-645-1438
email rharing@unitedco.net

# Exhibit K

Stefano Tomisti
Inviato da: Antonella
Bono

10/03/2008 17.50

Per:   "Ralph Haring" <RHaring@unitedco.net>
Cc:    "Gary Chilcot" <GChilcot@unitedco.net>, "Info Agenzia
       Carboni" <info@agenziacarboni.com>, "Reba Lawson"
       <RLawson@unitedco.net>,
Cc:    "Gary Chilcot" <GChilcot@unitedco.net>, "Info Agenzia
       Carboni" <info@agenziacarboni.com>, "Reba Lawson"
       <RLawson@unitedco.net>,
Oggetto:  Rif: March 28th Vessel

Dear Ralph,

I agree and accept your proposal to load a second hold of Pocahontas coal (about 9/10,000 mtons) on m/v LEDRA instead of the lacking Wellmore coal cargo previously stemmed. This quantity of Pocahontas coal to be invoiced to IC at the price of USD 135/mt and to be considered as portion of the agreement for FY 2008/2009 we reached last month of December 2008 but will be shipped under remaining contractual terms/conditions of UCC/IC 2007/08.

That way a total of 17,500 mtons max of Pocahontas coal will be loaded on m/v Ledra with loading date March 28 2008.

As per my previous email dd. March 7 we have still to speak of new shipping schedule concerning the remaining quantity of Wellmore coal at balance of contract 2007/08 .

Massimo and I are planning to go to United States during the first week of April and we would be glad to pay a visit to you if/when convenient to you.

Thank you very much for your support.
With my best regards
Stefano


"Ralph Haring" <RHaring@unitedco.net>



"Ralph Haring"
<RHaring@unitedco.n
et>

10/03/2008 13.33

Per:   <Stefano.Tomisti@italianacoke.it>
Cc:    "Gary Chilcot" <GChilcot@unitedco.net>, "Reba Lawson"
       <RLawson@unitedco.net>, "Info Agenzia Carboni"
       <info@agenziacarboni.com>
Oggetto:  March 28th Vessel

Dear Stefano,

UCC will able to load 9/10KMT Pocahontas instead of Wellmore coal on March 28th, 2008 vessel. The additional Pocahontas tons will be shipped under the conditions of UCC/Italiana Coke 2007 agreement except for price which will be at the 2008 agreed to price of $135.00 FOBT. UCC legal dept will hopefully have the new 2008 agreement in place sometime this week which I will forward for your review and then we can concentrate on getting the agreement signed.

Looking forward to your reply.

Kind regards

Ralph Haring
Vice President Sales
United Coal Company
1005 Glenway Avenue
Bristol, Virginia 24201
Tel.  276-645-1424
Cell  423-534-1093
Fax   276-645-1438

# Exhibit L



"Ralph Haring"
<rharing@unitedcoal.c
om>

26/03/2008 21.30

Per:  <Stefano.Tomisti@italianacoke.it>
Cc:  <agenziacarboni@tin.it>, "Gary Chilcot"
        <gchilcot@unitedcoal.com>
Oggetto:  2008/09 Wellmore/Pocahontas Coal Contract

Dear Stefano,

Please find UCC revised draft of the contract between UCC and Italiana Coke. The main issues for UCC were 10% Buyers option, pp. 15 was removed and Force Majeure clause inserted "unforeseeable geological conditions".

Looking forward to seeing you, Massimo and of course Monica in N.Y. next Wed.

Best regards,

Ralph Haring
Vice President of Sales
United Coal Company
1005 Glenway Ave.
Bristol, Virginia   24201
276-645-1424  Tel.
276-645-1438   Fax
423-534-1093    Cell
rharing@unitedco.net  e-mail

                                              

United · Italiana Coke ·2008· Draft Contract Wellmore.doc   United · Italiana Coke · 2008·draft contract Pocahontas.doc

*DRAFT*

*SALE AND PURCHASE AGREEMENT*
*WELLMORE HIGH VOLATILE COKING COAL*


THIS AGREEMENT made the 4th day of December 2007, where United Coal Company, LLC (SELLER), hereby agrees to sell coal and Italiana Coke S.p.a. (BUYER), agrees to buy coal under the terms and conditions hereinafter set forth.

 WITNESSETH:

 SELLER agrees to sell and deliver to Buyer and Buyer agrees to accept and pay for coal specified below under the terms and conditions hereinafter set forth:

1.    COMMODITY

Freshly mined High-Volatile Coking Coal from  Wellmore #8 mine owned and operated by Seller, Wellmore Coal Company LLC.

2.    QUANTITY

40,000 metric tonnes (the "Contract Quantity) +/- 10% to accommodate vessel size.

3.    DELIVERY OF THE GOODS - REQUEST OF STEMS

Shipments of the Contract Quantity shall be requested by Buyer in increments between 8,000 and 12,000 metric tonnes during the Term, with shipping dates to be mutually agreed with Seller, with both parties acting in good faith to schedule regular deliveries.  Buyer has to request stems in writing at least 45 days prior to the expected loading date for a cargo of coal subject hereto, and Seller has to confirm such proposed stems within five (5) working days from the date of Buyer's request.  In the event Seller fails to confirm stems, the stems shall be considered as confirmed by Seller.

4.    TERM

The Term of this Agreement shall commence on April 1, 2008 and end on March 31, 2009.

5.    <u>SPECIFICATIONS</u>

The coal delivered hereunder shall be "Wellmore High Volatile Coking Coal" and shall conform to the following typical (and guaranteed where indicated) specifications:

| | |
|---|---|
| Moisture (air) | 8.00 % max |
| On dry basis :<br>Volatile Matters (d.b.) | 32.0% max |
| Ash (d.b.) | 7.25% max |
| Sulfur (d.b.) | 0.95 % max |
| FSI | 7-9 |
| Arnu -Dilatation<br>Fluidity<br>Sizing | +240 min<br>25,000 ddpm min<br>0 X 50mm |

6.    <u>DELIVERY</u>

A) Coal shall be delivered hereunder FOBT (stowed and trimmed) vessel at the Norfolk Southern coal loading piers in Norfolk (Hampton Roads), Virginia, U.S.A. (the "Loading Port") with title and risk of loss and damage to the coal passing from Seller to Buyer upon loading into the vessel (as per INCOTERMS 2000).

B) Shipping Terms and Loading Conditions, Norfolk Southern Pier #6

(i)    <u>Loadport</u> - Hampton Roads, Norfolk, Virginia, USA, one good, safe and always acceptable berth.

(ii)    <u>Fixation of Laydays</u> - Buyer to give Seller thirty (30) days notice of fifteen (15) days laycan spread. Seller shall accept or refuse within forty-eight (48) consecutive hours thereafter. Upon nomination, Buyer or its agents shall give the vessel name, details and tonnage to be loaded plus or minus 5%, Buyer's option.

(iii)    <u>Nomination</u> - Buyer or its Agents to nominate the carrying vessel on the basis of a 15-day laycan.

(a) Buyer to give notice of ETA at Loading Port fourteen (14) days prior to the expected ETA of vessel

(b) Ten (10) days prior to the expected ETA at Loading Port, Buyer, or the owner or master of the vessel, to give definite notice of the vessel to be loaded.  Buyer shall be obligated to inform Seller in writing of the

final quantity to be loaded no less than ten (10) days before scheduled vessel loading. Further notices to be given 7, 5, 2 and 1 days prior to vessel ETA at Loading Port to confirm vessel arrival schedule at Loading Port.

Loading Terms - According to Norfolk Southern C-5222 Contract Conditions

Agents - Buyer to nominate its own agents at the Loading Port.

Railcar demurrage - Seller will be responsible for any railway car debit demurrage incurred if any cars remain of Seller shipments after completion of the loading of the vessel.

7.    LOADING AND DEMURRAGE

Seller takes the responsibility of having his own coal ready and available at Hampton Roads pier at the time of vessel's loading Date. If Seller fails to meet the specified loading requirements, demurrage shall be paid by Seller to Buyer for time so lost. Demurrage charges shall begin to accrue to Seller's account 24 hours after vessel's schedule loading date and will run until beginning of vessel loading. Vessel's demurrage to be reimbursed to Buyer based on demurrage rate as per governing Charter Party and based on: (a) the proportion of coal delivered by Seller bears to the total tons loaded on the vessel; and (b) the proportion of the number of days the vessel was delayed in loading as a result of Seller's delay in delivery bears to the total number of days of vessel delay.

In the event Norfolk Southern Railroad fails or refuses to supply adequate rail cars to SELLER for loading at the Seller's mines to meet a vessel load date on the grounds that other suppliers being loaded in the same vessel are not mine ready to load, SELLER shall not be liable for demurrage charges to Buyer, provided that SELLER may provide Norfolk Southern records to BUYER proving such situation and relevant responsible supplier(s) in default. In such a case only the non-performing seller(s) shall be held fully responsible for the total amount of vessel's demurrage.

Seller has to officially inform Buyer about exact time of coal arrival at Pier VI in H. Roads.

8.    PRICE

Firm price for the entire Term shall be USD $ 123.00 per metric ton F.O.B.T. vessel Norfolk Southern Pier VI. Fuel surcharge to be calculated each time a specific vessel loads and it will be based upon fuel pricing at that time - up to USD 0.50/metric ton for Seller's account - above USD 0.50/metric ton to be split 50/50 supplier/buyer - according with Railroad documentation.

4

9.    WEIGHT

The weights set forth on the Bills of Lading shall be the Railroad scale weight (Norfolk Southern Pier 6), accepted by both parties hereto as final and binding. The Norfolk Southern Railroad weight certificates shall support these weights.

10.    PAYMENT

Payment shall be made by Buyer to Seller in United States dollars not later than 30 days from the date set forth on the Bill of Lading from the loading vessel. Such payments shall be made by wire transfer to Seller's bank account as stated on the invoice.

11.    SAMPLING AND ANALYSIS

Mechanical sampling and analysis shall be made at the Loading Port, according to applicable ASTM Standards for Sampling and Analysis. The mechanical sampling shall be conducted by the company hired by the Terminal to perform such sampling. The Loading Port analysis shall be determined by an independent, first-class laboratory (the "Independent Laboratory", chosen by Seller and acceptable to Buyer, and the analysis performed by the Independent Laboratory shall be final for calculating the commercial terms for invoicing the value of the Coal sold. The Independent Laboratory shall send promptly by courier one sample (approximately 1 kilo of coal crashed to size below 5 mm) split from the composite sample to Buyer.   The cost for sampling and analysis shall be for Seller's account. Buyer has the right at any time after first notifying Seller to instruct a recognized, independent, first-class laboratory to carry out sampling and analysis at the discharging port. The costs of sampling/analyses performed at discharging port are for Buyer's account. In the event that there should be a substantial difference in quality and quantity results as determined at the Loading and Discharging Ports, Buyer and Seller shall meet to discuss a fair solution.

12.    DOCUMENTATION

SELLER shall provide the following documents to Buyer:

(i)      One original and three copies of Commercial Invoice
(ii)     First, second and third original and three copies non-negotiable Bills of Lading
(iii)    Original and two copies of Certificate of Origin
(iv)    Original and two copies of Railway Weight Certificate
(v)     Original and two copies of Stowage Plan
(vi)    Original and two copies of Statement of Facts
(vii)   Original and two copies of Notice of Readiness
(viii)  Original and two copies of Certificate of Analysis from Independent Laboratory
(ix)    Dump sheet

Seller shall promptly render all documentation to Buyer at the following address:

Dott. Stefano Tomisti
Italiana Coke S.p.A.
Via Stalingrado 25
17014 S. Giuseppe di Cairo  (Savona)
Italy

13.   <u>PENALTIES</u>

Should the results of the analysis by the Independent Laboratory carried out according to applicable ASTM Standards on each cargo exceed those specifications, penalties shall be assessed to the Seller in the following amounts:

MOISTURE:  If moisture content exceeds 8.00% on an "as received" basis, a penalty of 1.0% of the FOBT price shall apply for each 1.0% above 8.00%, fractions pro rata.

ASH:        If ash content exceeds 7.25% on a "dry basis", a penalty of 2.0% of the FOBT price shall apply for each 1.0% above 7.25%, fractions pro rata.

VOLATILE:  If volatile content exceeds 32.00% on a "dry basis", a penalty of 1.2% of the FOBT price shall apply for each 1% above 32.00%, fractions pro rata.

SULPHUR:   If sulphur content exceeds 0.95% on a "dry basis", a penalty of 2.0% of the FOBT price shall apply for each 0.1% above 0.95%, fractions pro rata.

14.   <u>FORCE MAJEURE</u>

Seller shall not be liable for delay, reduction, or suspension of deliveries resulting from any cause beyond its reasonable control and Buyer shall not be liable for any inability to accept delivery of coal under this Agreement resulting from any cause beyond its reasonable control, provided that Buyer or Seller, as the case may be, shall advise the other party promptly by a written notice describing the situation in detail. Such notice shall be accompanied by documentary evidence if available as to the occurrence of the event and the likely duration thereof and the party claiming force majeure shall promptly exert due diligence to remove such cause. Causes beyond reasonable control of Seller and Buyer shall include, but not be limited to, floods, fires, accidents, strikes, major breakdowns of equipment, shortages of transportation carrier's equipment caused by an event of Force Majeure declared by the transportation carrier, or other reasons, whether of the same or different nature, existing or future, foreseen or unforeseeable geological conditions, which are beyond the control and without the fault or negligence of the parties hereto but specifically excluding economic factors alone. No suspension or reduction for reason of Force Majeure shall invalidate the remainder of this Contract; but, on removal of the cause, delivery shall resume at the specified date mutually agreed between buyer and seller.

15.   GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the law of the State of New York.

16.   ARBITRATION

All disputes, controversies or claims between the parties in connection with this Agreement shall be determined by arbitration at New York, N.Y., in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

17.   MUTUAL COOPERATION

The parties recognize that circumstances may arise which could not have been foreseen at the time this Agreement was executed. The parties agree that they will use their best efforts to solve any problems due to any such unforeseeable circumstances in the spirit of mutual understanding and in good faith.

18.   LIMITATION OF LIABILITY

In no event shall either party be responsible to the other for incidental, special or consequential damages arising out of a default in the performance of any of its covenants or obligations hereunder. Seller's contractual liabilities and Buyer's contractual remedy for coal not in conformance with the specifications of this Agreement shall be limited to the provisions of this Agreement.

19.   DISCLAIMER OF IMPLIED WARRANTIES

SELLER HEREBY DISCLAIMS, AND BUYER HEREBY WAIVES, ANY AND ALL IMPLIED AND STATUTORY WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND ANY WARRANTIES ARISING FROM ANY COURSE OF DEALING OR USAGE OF TRADE.

20.   GOVERNMENT IMPOSITION

This Agreement and the performance of all provisions hereof are expressly subject to any present or future laws and to all rules and regulations promulgated by any governmental agency having jurisdiction which may preclude or curtail Seller's right or ability to produce Coal to be delivered hereunder or Buyer's right or ability to receive deliveries hereunder. Provided, however, the terms of this paragraph shall not, in any event, excuse Buyer from the payment for coal already shipped on board a nominated and accepted vessel.

21.   ASSIGNMENT

Seller agrees not to assign or sublet or delegate this contract or any part thereof or any payment to be received hereunder without consent of the Buyer.

22.   NOTIFICATION

All notifications given in relation to this Agreement shall be sent to the addresses below, by prepaid registered airmail, written in English, or by telefacsimile. Notice shall be deemed to be given when such letter or telefacsimile arrives at the address below:

    To Buyer:    Italiana Coke S.p.a.
                 Via Stalingrado 25
                 17014 S. Giuseppe di Cairo
                 Italy
                 Tel.:    +39 019-5067220
                 Fax:    +39 019-5067902
                 E-mail: mat.log@italianacoke.it

    To Seller:    United Coal Company
                  1005 Glenway Avenue
                  Bristol, Virginia  24201 USA

                  Tel. 276-466-3322
                  Fax 276-645-1438
                  E-mail rharing@unitedco.net

23.   CAPTIONS

Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.

24.   ENTIRE AGREEMENT

This Agreement contains the entire agreement between the parties and supersedes any and all prior representations, understandings and agreements, oral or written, which are not included herein. This Agreement cannot be altered or amended except by issuance of an addendum signed by authorized representatives of the parties.

IN WITNESS WHEREOF, the parties hereto have caused the Agreement to be executed by their respective officers hereunder duly authorized, as of the day and year first above written.

Buyer:                              Seller:
Italiana Coke S.p.A.                United Coal Company

By:_____         By:_____

8

Date: December 4<sup>th</sup>, 2007                    Date:_____



*DRAFT*

*SALE AND PURCHASE AGREEMENT*
*POCAHONTAS LOW VOLATILE COKING COAL*


THIS AGREEMENT made the 4th day of December 2007, where United Coal Company, LLC (SELLER), hereby agrees to sell coal and Italiana Coke S.p.a. (BUYER), agrees to buy coal under the terms and conditions hereinafter set forth.

WITNESSETH:

SELLER agrees to sell and deliver to Buyer and Buyer agrees to accept and pay for coal specified below under the terms and conditions hereinafter set forth:

1. COMMODITY

   Pocahontas Low Volatile Coking Coal from  the Josephine #1, Josephine #2 and Tommy Creek mines owned and operated by Seller.

2. QUANTITY

   40,000 metric tonnes (the "Contract Quantity) +/- 10% to accommodate vessel size.

3. DELIVERY OF THE GOODS - REQUEST OF STEMS

   Shipments of the Contract Quantity shall be requested by Buyer in increments between 8,000 and 12,000 metric tonnes during the Term, with shipping dates to be mutually agreed with Seller, with both parties acting in good faith to schedule regular deliveries.  Buyer has to request stems in writing at least 45 days prior to the expected loading date for a cargo of coal subject hereto, and Seller has to confirm such proposed stems within five (5) working days from the date of Buyer's request.  In the event Seller fails to confirm stems, the stems shall be considered as confirmed by Seller.

4. TERM

   The Term of this Agreement shall commence on April 1, 2008 and end on March 31, 2009.

5.    <u>SPECIFICATIONS</u>

The coal delivered hereunder shall be "Pocahontas Low Volatile Coking Coal" and shall conform to the following typical (and guaranteed where indicated) specifications:

| | |
|---|---|
| Moisture (air) | 9.00 % max |
| On dry basis :<br>Volatile Matters (d.b.) | 17.50% max |
| Ash (d.b.) | 7.25% +0.25% max |
| Sulfur (d.b.) | 0.95 % max |
| FSI | 7-9 |
| Arnu -Dilatation | +40 |
| Gieseler (DDPM) | +50 |
| Mean-max reflectance | 1.64 |
| Sizing | 0 X 50mm |

6.    <u>DELIVERY</u>

A) Coal shall be delivered hereunder FOBT (stowed and trimmed) vessel at the Norfolk Southern coal loading piers in Norfolk (Hampton Roads), Virginia, U.S.A. (the "Loading Port") with title and risk of loss and damage to the coal passing from Seller to Buyer upon loading into the vessel (as per INCOTERMS 2000).

B) Shipping Terms and Loading Conditions, Norfolk Southern Pier #6

(i)    <u>Loadport</u> - Hampton Roads, Norfolk, Virginia, USA, one good, safe and always acceptable berth.

(ii)    <u>Fixation of Laydays</u> - Buyer to give Seller thirty (30) days notice of fifteen (15) days laycan spread. Seller shall accept or refuse within forty-eight (48) consecutive hours thereafter. Upon nomination, Buyer or its agents shall give the vessel name, details and tonnage to be loaded plus or minus 5%, Buyer's option.

(iii)    <u>Nomination</u> - Buyer or its Agents to nominate the carrying vessel on the basis of a 15-day laycan.

(a) Buyer to give notice of ETA at Loading Port fourteen (14) days prior to the expected ETA of vessel

(b) Ten (10) days prior to the expected ETA at Loading Port, Buyer, or the owner or master of the vessel, to give definite notice of the vessel to be loaded.  Buyer shall be obligated to inform Seller in writing of the

final quantity to be loaded no less than ten (10) days before scheduled vessel loading. Further notices to be given 7, 5, 2 and 1 days prior to vessel ETA at Loading Port to confirm vessel arrival schedule at Loading Port.

Loading Terms - According to Norfolk Southern C-5222 Contract Conditions

Agents - Buyer to nominate its own agents at the Loading Port.

Railcar demurrage - Seller will be responsible for any railway car debit demurrage incurred if any cars remain of Seller shipments after completion of the loading of the vessel.

7.    LOADING AND DEMURRAGE

Seller takes the responsibility of having his own coal ready and available at Hampton Roads pier at the time of vessel's loading Date. If Seller fails to meet the specified loading requirements, demurrage shall be paid by Seller to Buyer for time so lost. Demurrage charges shall begin to accrue to Seller's account 24 hours after vessel's schedule loading date and will run until beginning of vessel loading. Vessel's demurrage to be reimbursed to Buyer based on demurrage rate as per governing Charter Party and based on: (a) the proportion of coal delivered by Seller bears to the total tons loaded on the vessel; and (b) the proportion of the number of days the vessel was delayed in loading as a result of Seller's delay in delivery bears to the total number of days of vessel delay.

In the event Norfolk Southern Railroad fails or refuses to supply adequate rail cars to SELLER for loading at the Seller's mines to meet a vessel load date on the grounds that other suppliers being loaded in the same vessel are not mine ready to load, SELLER shall not be liable for demurrage charges to Buyer, provided that SELLER may provide Norfolk Southern records to BUYER proving such situation and relevant responsible supplier(s) in default. In such a case only the non-performing seller(s) shall be held fully responsible for the total amount of vessel's demurrage.

Seller has to officially inform Buyer about exact time of coal arrival at Pier 6 in H. Roads.

8.    PRICE

Firm price for the entire Term shall be USD $ 135.00 per metric ton F.O.B.T. vessel Norfolk Southern Pier VI. Fuel surcharge to be calculated each time a specific vessel loads and it will be based upon fuel pricing at that time - up to USD 0.50/metric ton for Seller's account - above USD 0.50/metric ton to be split 50/50 supplier/buyer - according with Railroad documentation.

4

9.   WEIGHT

The weights set forth on the Bills of Lading shall be the Railroad scale weight (Norfolk Southern Pier 6), accepted by both parties hereto as final and binding. The Norfolk Southern Railroad weight certificates shall support these weights.

10.   PAYMENT

Payment shall be made by Buyer to Seller in United States dollars not later than 30 days from the date set forth on the Bill of Lading from the loading vessel. Such payments shall be made by wire transfer to Seller's bank account as stated on the invoice.

11.   SAMPLING AND ANALYSIS

Mechanical sampling and analysis shall be made at the Loading Port, according to applicable ASTM Standards for Sampling and Analysis. The mechanical sampling shall be conducted by the company hired by the Terminal to perform such sampling. The Loading Port analysis shall be determined by an independent, first-class laboratory (the "Independent Laboratory", chosen by Seller and acceptable to Buyer, and the analysis performed by the Independent Laboratory shall be final for calculating the commercial terms for invoicing the value of the Coal sold. The Independent Laboratory shall send promptly by courier one sample (approximately 1 kilo of coal crashed to size below 5 mm) split from the composite sample to Buyer.  The cost for sampling and analysis shall be for Seller's account. Buyer has the right at any time after first notifying Seller to instruct a recognized, independent, first-class laboratory to carry out sampling and analysis at the discharging port. The costs of sampling/analyses performed at discharging port are for Buyer's account. In the event that there should be a substantial difference in quality and quantity results as determined at the Loading and Discharging Ports, Buyer and Seller shall meet to discuss a fair solution.

12.   DOCUMENTATION

SELLER shall provide the following documents to Buyer:

(i)      One original and three copies of Commercial Invoice
(ii)     First, second and third original and three copies non-negotiable Bills of Lading
(iii)    Original and two copies of Certificate of Origin
(iv)    Original and two copies of Railway Weight Certificate
(v)     Original and two copies of Stowage Plan
(vi)    Original and two copies of Statement of Facts
(vii)   Original and two copies of Notice of Readiness
(viii)  Original and two copies of Certificate of Analysis from Independent Laboratory
(ix)    Dump sheet

Seller shall promptly render all documentation to Buyer at the following address:

Dott. Stefano Tomisti
Italiana Coke S.p.A.
Via Stalingrado 25
17014 S. Giuseppe di Cairo  (Savona)
Italy

13.    <u>PENALTIES</u>

Should the results of the analysis by the Independent Laboratory carried out according to applicable ASTM Standards on each cargo exceed those specifications, penalties shall be assessed to the Seller in the following amounts:

MOISTURE:  If moisture content exceeds 9.00% on an "as received" basis, a penalty of 1.0% of the FOBT price shall apply for each 1.0% above 9.00%, fractions pro rata.

ASH:       If ash content exceeds 7.50% on a "dry basis", a penalty of 2% of the FOBT price shall apply for each 1.0% above 7.25%, fractions pro rata.

VOLATILE:  If volatile content exceeds 17.50% on a "dry basis", a penalty of 1.2% of the FOBT price shall apply for each 1% above 17.50%, fractions pro rata.

SULPHUR:   If sulphur content exceeds 0.95% on a "dry basis", a penalty of 2.0% of the FOBT price shall apply for each 0.1% above 0.95%, fractions pro rata.

14.    <u>FORCE MAJEURE</u>

Seller shall not be liable for delay, reduction, or suspension of deliveries resulting from any cause beyond its reasonable control and Buyer shall not be liable for any inability to accept delivery of coal under this Agreement resulting from any cause beyond its reasonable control, provided that Buyer or Seller, as the case may be, shall advise the other party promptly by a written notice describing the situation in detail. Such notice shall be accompanied by documentary evidence if available as to the occurrence of the event and the likely duration thereof and the party claiming force majeure shall promptly exert due diligence to remove such cause. Causes beyond reasonable control of Seller and Buyer shall include, but not be limited to, floods, fires, accidents, strikes, major breakdowns of equipment, shortages of transportation carrier's equipment caused by an event of Force Majeure declared by the transportation carrier, or other reasons, whether of the same or different nature, existing or future, foreseen or unforeseeable geological conditions, which are beyond the control and without the fault or negligence of the parties hereto but specifically excluding economic factors alone. No suspension or reduction for reason of Force Majeure shall invalidate the remainder of this Contract; but, on removal of the cause, delivery shall resume at the specified date mutually agreed between buyer and seller.

6

15.    GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the law of the State of New York.

16.    ARBITRATION

All disputes, controversies or claims between the parties in connection with this Agreement shall be determined by arbitration at New York, N.Y., in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

17.    MUTUAL COOPERATION

The parties recognize that circumstances may arise which could not have been foreseen at the time this Agreement was executed. The parties agree that they will use their best efforts to solve any problems due to any such unforeseeable circumstances in the spirit of mutual understanding and in good faith.

18.    LIMITATION OF LIABILITY

In no event shall either party be responsible to the other for incidental, special or consequential damages arising out of a default in the performance of any of its covenants or obligations hereunder. Seller's contractual liabilities and Buyer's contractual remedy for coal not in conformance with the specifications of this Agreement shall be limited to the provisions of this Agreement.

19.    DISCLAIMER OF IMPLIED WARRANTIES

SELLER HEREBY DISCLAIMS, AND BUYER HEREBY WAIVES, ANY AND ALL IMPLIED AND STATUTORY WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND ANY WARRANTIES ARISING FROM ANY COURSE OF DEALING OR USAGE OF TRADE.

20.    GOVERNMENT IMPOSITION

This Agreement and the performance of all provisions hereof are expressly subject to any present or future laws and to all rules and regulations promulgated by any governmental agency having jurisdiction which may preclude or curtail Seller's right or ability to produce Coal to be delivered hereunder or Buyer's right or ability to receive deliveries hereunder. Provided, however, the terms of this paragraph shall not, in any event, excuse Buyer from the payment for coal already shipped on board a nominated and accepted vessel.

21.    ASSIGNMENT

Seller agrees not to assign or sublet or delegate this contract or any part thereof or any payment

to be received hereunder without consent of the Buyer.

22.    <u>NOTIFICATION</u>

All notifications given in relation to this Agreement shall be sent to the addresses below, by prepaid registered airmail, written in English, or by telefacsimile. Notice shall be deemed to be given when such letter or telefacsimile arrives at the address below:

To Buyer:    Italiana Coke S.p.a.
Via Stalingrado 25
17014 S. Giuseppe di Cairo
Italy
Tel.:    +39 019-5067220
Fax:    +39 019-5067902
E-mail: mat.log@italianacoke.it

To Seller:    United Coal Company
1005 Glenway Avenue
Bristol, Virginia  24201 USA

Tel. 276-466-3322
Fax 276-645-1438
E-mail rharing@unitedco.net

23.    <u>CAPTIONS</u>

Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.

24.    <u>ENTIRE AGREEMENT</u>

This Agreement contains the entire agreement between the parties and supersedes any and all prior representations, understandings and agreements, oral or written, which are not included herein. This Agreement cannot be altered or amended except by issuance of an addendum signed by authorized representatives of the parties.

IN WITNESS WHEREOF, the parties hereto have caused the Agreement to be executed by their respective officers hereunder duly authorized, as of the day and year first above written.

Buyer:                                          Seller:
Italiana Coke S.p.A.                             United Coal Company

By:_____                      By:_____

Date: December 4th, 2007                         Date:_____

8



# Exhibit M

THIS AGREEMENT entered into as of the 3rd day of April, 2008, by and between **ITALIANA COKE** ("Buyer") and **UNITED COAL COMPANY** ("Seller").

## WITNESSETH

1.    The parties disagree whether a contract exists between themselves for the supply of coal year beginning April 1, 2008 and continuing through March 31, 2009.

2.    There are two existing written coal supply agreements between Seller's subsidiaries, Wellmore Coal Company and Pocahontas Coal Company, and Buyer, for the coal year 2007, which terminated on March 31, 2007 (the "2007 Contracts"). The parties agree that as of the expiration of the 2007 Contracts, in order to complete their obligations thereunder, Seller's subsidiaries were obligated to deliver to Buyer 7,500 metric tonnes of low volatile coking coal from Pocahontas Coal Company, and 14,000 metric tonnes of mid volatile coking coal from Wellmore Coal Company.

3.    The parties agree that Seller's obligations under the 2007 Contracts shall be satisfied and discharged as set forth herein. In order to satisfy its obligation to deliver the remaining low volatile tonnage from Pocahontas Coal Company, Seller shall supply 7,500 metric tonnes of Pocahontas coking coal to be loaded at Norfolk, Virginia, on or about April 3, 2008. In order to satisfy its obligation to deliver the 14,000 metric tonnes remaining on the contract between Buyer and Wellmore Coal Company, Seller shall deliver 10,500 metric tonnes of low volatile coking coal from Pocahontas Coal Company to be loaded in the same vessel as the 7,500 metric tonnes described in the preceding sentence. Buyer covenants and agrees that by accepting the aforementioned quantities of low volatile coking coal in the vessel to be loaded on or about April 3, 2008, Buyer considers Seller's subsidiaries to have fully performed under the 2007 Contracts, and that except for Buyer's obligation to pay for the coal so loaded as provided in the 2007 Contracts, the 2007 Contracts shall be terminated.

4.    The parties agree that the first 7,500 metric tonnes loaded on or about April 3, 2008 shall be paid for by Buyer to United Coal Company at the price provided in the 2007 Contract between Buyer and Pocahontas Coal Company. The parties further agree that the price for the remaining 10,500 metric tonnes to be loaded shall be the price set forth in the 2007 Contract between Buyer and Wellmore Coal Company for Wellmore mid volatile coking coal.

5.    Buyer shall pay timely to United Coal Company for the coal loaded on or about April 3, 2008 in accordance with the terms set forth in the 2007 Contracts.



6.    As set forth in paragraph 1 above, a dispute has arisen between Buyer and Seller about the existence of a contract for the coal year beginning April 1, 2008 (the "2008 Coal Year"). In entering this agreement the parties agree that neither shall be prejudiced with respect to their respective rights, claims or remedies relating to whether there is in fact any agreement between the parties for the 2008 Coal Year.

7.    This agreement is entered to avoid any damages or claims that might have existed under the 2007 Contracts, or that might exist for the loading of the current vessel located at Norfolk, Virginia scheduled to begin loading on or about April 3, 2008.

DATED this 3rd day of April, 2008.

**ITALIANA COKE**

By: _____

Title: MANAGING DIRECTOR & COAL PURCHASE MNGR

**UNITED COAL COMPANY**

By: _____

Title: Vice President & Secretary

# Exhibit N



# Italiana Coke

17014 CAIRO MONTENOTTE (SAVONA)
Via Stalingrado, 25
Tel. +39 019.506711 Fax +39 019.5067900

Cairo, April 15 2008

Messrs.
UNITED COAL COMPANY
1005 Glenway Avenue
Bristol, Virginia 24201
U S A

K.A. MR. RALPH HARING

CC: MR. G. CHILCOT
CC: Agenzia Carboni-Genoa

Dear Ralph,

Reference is made to the meeting in New York on April 3rd.

1) We were shocked at your allegation, made at such meeting and confirmed in the agreement entered on the same date, that no contract exists for the supply of the coal in the year beginning on the April 1st. In fact a contract obviously exists and both ourselves and yourselves have behaved in the last months on such grounds.

2) For sake of clarity we set out here below our views regarding the said contract.

i) a binding agreement was entered at the meeting held in Stockholm at the beginning of December last year. The terms of such agreement are set out in detail in Agenzia Carboni's e-mail 7.12.2007 and in our (Stefano's) e-mail 10.12.2007.

ii) on the 14.12.2007 you sent us a message confirming the terms indicated in the above mentioned messages but requiring to change the Pocahontas moisture quality from 8% to 9% max. Our agreement on such proposal of amendment of the contractual conditions was immediately communicated.

Following such exchanges the agreement binding the parties resulted to be the one entered at the meeting in December, amended as above. However, should you maintain that the proposal set out in your message 14.12.2007 was not accepted, the only consequence would be that the unamended agreement mentioned under paragraph i) above would apply.

iii) on the 26.3.2008 you sent us drafts of contracts. In your message you pointed out that you proposed some further amendments concerning 10% buyers' option, clause 15 and force majeure clause. This message and the amended draft contracts attached thereto (which, inter alia, contain the 9% moisture provision previously agreed) amount to a confirmation of the existence of the binding agreement quoted above, the amendment of which was proposed but never discussed or agreed upon due to the stance adopted by you at the meeting in New York.

3) As the position appearing from the facts outlined at paragraph 2) above cannot be denied, we still believe that the statements you rendered at the meeting in New York result from an incomplete perusal of the documents and evidence relevant to the case. We also trust that on receipt of this message and after appreciating the indisputableness of the above, you will reconsider the position and confirm that you agree upon the existence of an ageement and that you are willing to abide by it.

Therefore, here below we set out our request of stems for the first supplies under the 2008 contracts. It is needless to say that failing the confirmation within the relevant deadline that you are willing to perform the existing agreement, we would be left with no other alternative than taking action to protect our interests.

4)
Request of stem:

1



# Italiana Coke

17014 CAIRO MONTENOTTE (SAVONA)
Via Stalingrado, 25
Tel. +39 019.506711 Fax +39 019.5067900

we hereby request you to confirm following stems:

- Period of loading in Norfolk: June 20-30, 2008
- Quantities and qualities:
    1) about 8/10,000 metric tons of high volatile Wellmore coal
    2) about 8/10,000 metric tonf of low volatile Pocahontas coal

This message is entirely without prejudice to all our rights and remedies which are hereby expressly reserved.

With our best regards.

ITALIANA COKE S.R.L.
Via S. Vincenzo, 2 -16121 GENOVA
Cod. fisc. e Partita IVA: 01741840993
Registro imprese Genova: 0174184099;
R.E.A. Genova n.:432165

Massimo Busdraghi / Stefano Tomisti

ITALIANA COKE S.r.l. – Sede Legale Via San Vincenzo, 2  16121 Genova   Capitale Sociale € 13.200.000,00 i.v.
Codice Fiscale 01741840993
Partita IVA 01741840993 - Partita IVA CEE IT01741840993

# Exhibit O

Apr. 18. 2008  9:21AM                                          No. 0830   P. 1



# The United Company

## Fax Cover Sheet

| To: | Massimo Busdraghi<br>Stefano Tomisti | From: | Brian Sullivan |
|---|---|---|---|
| Company: | Italiana Coke S. R. L. | Phone Number: | 276-645-1444 |
| Fax Number: | 39 019.5067902 | Fax Number: | 276-645-1431 |
| Phone Number: | 39 019.506711 | Email: | sullivan@unitedco.net |
| Date: | April 18, 2008 | Total # of pages including cover: | 3 |

Notes/Comments:

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately at the above telephone number and return the original message to us at the above address via the U.S. Postal Service. Thank you.

**1005 Glenway Avenue**                                    **Bristol, VA 24201**

Apr. 18. 2008  9:21AM                                                              No. 0830    P. 2



1005 Glenway Avenue
Bristol, Virginia 24201-3473
(276) 466-5322                    United Coal Company

April 18, 2008


VIA FACSIMILE & OVERNIGHT MAIL


Massimo Busdraghi
Stefano Tomisti
Italiana Coke S.R.L.
17104 Cairo Montenotte (SAVONA)
Via Stalingrado, 25
Tel. +39 019.506711

Dear Messrs. Busdraghi and Tomisti:

     I write in response to your April 15, 2008 letter, in which you assert that you were "shocked" to learn of United's position that no contract exists for the 2008-2009 coal year. Given the circumstances, it is difficult to understand how Italiana Coke could reasonably believe a binding contract for 2008-2009 was ever reached.

     As you know, unlike our fully executed 2007-2008 contract, the parties never agreed upon and executed a written agreement for the 2008-2009 coal year. Both parties plainly understood that unless and until a written contract was executed by both, neither would be contractually bound. Notably, in a March 8, 2008 email from Ralph Haring to Stefano Tomisti, Mr. Haring made it clear that "[t]he 2008 coal year contract between UCC and Italiana Coke must be concluded, agreed to, and signed by both UCC and Italiana Coke prior to any shipments under the 2008 agreement." The correspondence makes clear that while drafts were circulated, none was ever agreed upon and signed; indeed, both sides made clear that the final written contract would have to be approved before any contractual obligations would arise. Given that no signed, written contract has been effectuated for 2008-2009, United's position that we do not have a binding agreement should come as no shock to you.

     Moreover, it is clear from the correspondence that there were material business terms that had not been agreed upon and which were still being negotiated. As you acknowledged in your April 15th letter, the parties had not agreed to contractual provisions concerning the "10% buyers' option," "clause 15," and the force majeure clause. These are material terms of the contract upon which we have yet to reach agreement, and for which there is no guarantee we will ever reach agreement.

     While there is presently no contractual obligation for Italiana Coke to purchase, or for United to sell, 2008-2009 coal, we remain interested and willing to continue our discussions to see if a mutually acceptable contract can be reached, and we invite you to discuss this matter further with us.

Sincerely,

Brian D. Sullivan
Vice President, Secretary & General Counsel
United Coal Company